UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

S.H. AND K.H., on behalf of their daughter, A.N.H.,
a student with a disability,

                      Plaintiffs,                Case No.: 3:10-CV-0723
                                                  (GTS/ATB)

v.

BD. OF EDUC. OF ONEONTA CITY SCH. DIST.,
                             Defendant.
_____

APPEARANCES:                          OF COUNSEL:

LEGAL SERVS. OF CENT. NEW YORK–SYRACUSE   CRYSTAL M. DOODY, ESQ.
  Counsel for Plaintiffs                     SUSAN M. YOUNG, ESQ.
472 South Salina Street, Suite 300
Syracuse, New York 13202

YOUNG / SOMMER LLC                      KENNETH S. RITZENBERG, ESQ.
  Counsel for Defendant
Five Palisades Drive
Albany, New York 12205

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this civil rights action filed by S.H. and K.H. ("Plaintiffs")

on behalf of their daughter A.N.H. against the Board of Education of the Oneonta City School

District ("Defendant" or "the District") pursuant to the Individuals with Disabilities Education

Act ("IDEA"), Article 89 of New York Education Law, and Section 504 of the Rehabilitation

Act, are Defendant's motion for summary judgment (Dkt. No. 12), Plaintiffs' cross-motion for

summary judgment (Dkt. No. 14), and Defendant's "cross-motion" for summary judgment (Dkt.

No. 17).  For the reasons set forth below, both Defendant's motion and Plaintiffs' cross-motion

are granted in part and denied in part; and Defendant's "cross-motion" is denied as moot.

# TABLE OF CONTENTS

I.    RELEVANT BACKGROUND.................................................................3
      A.    Plaintiffs' Complaint and Defendant's Counterclaims...................3
      B.    Factual Background.................................................................4
            1.    The 2006-2007 School Year.............................................4
            2.    The 2007-2008 School Year.............................................7
            3.    The 2008-2009 School Year...........................................23
            4.    The 2009-2010 School Year...........................................35
      C.    Administrative Decisions.......................................................38
            1.    Decision of Impartial Hearing Officer.............................38
            2.    Decision of State Review Officer...................................41
      D.    Briefing on Parties' Motions for Summary Judgment..................44
            1.    Parties' Arguments on Defendant's Motion......................46
            2.    Parties' Arguments on Plaintiffs' Cross-Motion................50

II.   GOVERNING LEGAL STANDARDS.................................................54
      A.    Motions for Summary Judgment in IDEA Actions........................54
      B.    Claims for Tuition Reimbursement Under the IDEA......................56
      C.    Claims Under Section 504 of the Rehabilitative Act....................59

III.  ANALYSIS.................................................................................60
      A.    Whether Plaintiffs Are Entitled to Tuition Reimbursement Under the
            IDEA and NY Education Law for the 2008-2009 School Year.........60
            1.    Whether the District Denied A.N.H. a FAPE.....................60
            2.    Whether the Family Foundation Was an Appropriate
                  Placement to Meet A.N.H.'s Special Needs.......................61
            3.    Whether the Equities Favor Tuition Reimbursement............69
      B.    Whether Plaintiffs Are Entitled to Tuition Reimbursement Under the
            IDEA and NY Education Law for the 2009-2010 School Year.........72
            1.    Whether the District Denied A.N.H. a FAPE.....................72
            2.    Whether the Family Foundation Was an Appropriate
                  Placement to Meet A.N.H.'s Special Needs.......................73
            3.    Whether the Equities Favor Tuition Reimbursement............73
      C.    Whether the District Acted with Bad Faith and/or Gross Misjudgment
            Under Section 504 of the Rehabilitation Act...........................76

I.     RELEVANT BACKGROUND

A.     Plaintiffs' Complaint and Defendant's Counterclaims

Generally, Plaintiffs' Complaint asserts the following two claims against Defendant arising from events occurring between 2008 and 2010: (1) a claim that Defendant deprived Plaintiffs' daughter A.N.H. of a free appropriate public education ("FAPE"), in violation of the IDEA and Article 89 of New York Education Law, by failing to classify her as emotionally disturbed and failing to develop an Individualized Education Program ("IEP") for her until April 2009, and then failing to develop an IEP for her that recommended a specific placement at a school that had considered her for admission or accepted her as a student, thus entitling Plaintiffs to reimbursement for the costs of placing her at the Family Foundation School ("Family Foundation") for the 2008-2009 school year and the 2009-2010 school year; and (2) a claim that Defendant violated A.N.H.'s rights under Section 504 of the Rehabilitation Act by failing to properly evaluate and place her in an appropriate educational setting, thus entitling Plaintiffs to compensatory and monetary relief, including tuition reimbursement if not otherwise available under the IDEA.  (*See generally* Dkt. No. 1.)

In asserting these two claims, Plaintiffs challenge certain portions of a decision of a State Review Officer ("SRO").  (*Id.*)   More specifically, Plaintiffs challenge the SRO's following conclusions regarding the 2008-2009 school year: (1) while the District deprived A.N.H. of a FAPE for the period of May 1, 2009, to June 25, 2009, the District did not deprive A.N.H. of a FAPE with regard to the remaining 2008-2009 school year (i.e., up until May 1, 2009); (2) moreover, the Family Foundation was not an appropriate placement for A.N.H. for the 2008-2009 school year; (3) furthermore, the equities did not support tuition reimbursement for the

2008-2009 school year.  (*Id.*)  In addition, Plaintiffs challenge the SRO's following conclusions

regarding the 2009-2010 school year: (1) while the District deprived A.N.H. of a FAPE for

2009-2010 school year, the Family Foundation was not an appropriate placement for A.N.H. for

the 2009-2010 school year; and (2) furthermore, the equities did not support tuition

reimbursement for the 2009-2010 school year.  (*Id.*)

Generally, Defendant's Answer asserts the following two counterclaims against

Plaintiffs: (1) a counterclaim requesting that the Court overturn as factually and legally incorrect

the finding of the SRO that the District failed to provide a FAPE to A.N.H. from May 1, 2009, to

June 25, 2009; and (2) a counterclaim requesting that the Court overturn as factually and legally

incorrect the SRO's finding that the District failed to provide a FAPE to A.N.H. for the 2009-

2010 school year.  (*See generally* Dkt. No. 6.)

**B.      Factual Background**

**1.      The 2006-2007 School Year**

A.N.H. was born in 1992.  She attended a District elementary school beginning in 2001.

Before the fall of 2006, while in the regular education program, A.N.H. did her school work and

achieved grades in the 80s range, performing at or above average academically.

However, in the fall of 2006, when A.N.H. was in the 9th grade, A.N.H.'s academic

performance began to decline.  A.N.H.'s mother believed that A.N.H. had become isolated and

withdrawn.

In the fall of 2006, A.N.H.'s parents met with District staff to address A.N.H.'s declining

academic performance.  During the 2006-2007 school year, A.N.H. remained in the District's

regular education program, but started receiving some Academic Intervention Services ("AIS")

and Compensatory Education ("Comp Ed") services.  AIS and Comp Ed are remedial and

support services for academically struggling students.

In November 2006, Plaintiffs consulted a private psychiatric nurse practitioner (Theresa

Von Hassel), who offered A.N.H. a "tentative" diagnosis of a bipolar disorder, and prescribed

medications for "depression" and "mood stability."  (Dkt. No. 29, Attach. 5, at 12-14, 24

[attaching pages "478" through "480," and "490," of transcript].)  A.N.H.'s mother testified that

she believed she mentioned this treatment to two District staff members, although she could not

swear to that fact.   (Dkt. No. 29, Attach. 5, at 14-15 [attaching pages "480" and "481" of

transcript].)

In January 2007, A.N.H. was caught shoplifting in Utica, New York, after which

Plaintiffs filed a Persons In Need of Supervision ("PINS") Petition.  A.N.H. was thereafter

assigned a probation officer and was required to see a psychologist.

On or about April 26, 2007, A.N.H.'s mother requested, with A.N.H.'s Counselor (Susan

Garcia), that the District evaluate A.N.H.  More specifically, A.N.H.'s Counselor filled out a

form dated April 26, 2007, requesting that this be a non-Committee on Special Education

("CSE") evaluation.[1]  A.N.H.'s mother knew the evaluation request was a non-CSE referral.

However, she was not "conscious of a real distinction between CSE and non-CSE" referrals

(despite the fact that, at the time, she had been employed as a high school English teacher in the

District since July 2000, was certified as a public school teacher, and was familiar with CSE

_____

[1]    The District's Interim Business Officer and the District's Director of Special
Education (Gary Koutnik) testified the purpose of a "non-CSE" referral as "a way of providing
some assessment services for students for whom a disabling condition isn't immediately
suspected, but about whom we'd like to gather more information." (Dkt. No. 28, Attach. 4, at 75
[attaching page "75" of transcript].)

procedures including referrals).  In describing A.N.H.'s difficulty with mathematics, the

evaluation request, signed by A.N.H.'s Counselor, stated in part that, "[w]hen the student is

engaged in the lesson she seems ok, and comprehends the material.  The problem is she chooses

not to do the work so her grades suffer."  In describing A.N.H.'s difficulty with English, the

evaluation request stated in part that A.N.H. "very often blanks out," has trouble paying attention

because she "drifts," and has trouble answering out loud because she gets "ter[r]ifically

nervous."  In describing A.N.H's behavioral difficulties, the evaluation request stated in part that

A.N.H. was "possibl[y] withdrawn," and "seems very immature socially (almost [at] a 4th grade

level)."  A.N.H. refused to participate in the evaluation process.  The school psychologist

assured A.N.H.'s mother that they would be available in the future if A.N.H. changed her mind

about completing the evaluation process.

    By late-May 2007, A.N.H. had received 25 incident discipline reports due to cutting

classes, cutting detention, unexcused absences or leaving school without permission, disrupting

classes, or perpetual tardiness.  (Dkt. No. 29, at 17-23 [attaching pages "1" through "5" of Def.'s

Ex. 3].)  A.N.H.'s mother testified that, by late-May 2007, it became apparent that A.N.H. would

not pass any courses of the 2006-2007 school year.  (Dkt. No. 29, Attach. 5, at 20 [attaching

page "486" of transcript].)  On or about May 27, 2007, Plaintiffs removed A.N.H. from school.

Plaintiffs sent A.N.H. to live with her grandmother (who had been a teacher) in Jacksonville,

Florida.  While in Florida, A.N.H. was not enrolled in school there; rather, she was still enrolled

in the Oneonta School District during that time.  (When she went to Florida, A.N.H. took with

her the assignments that her teachers at school had given her, although she did not complete

those assignments to anyone's satisfaction, and thus did not earn any passing grades for the

classes in which the assignments had been given.)  At the end of June 2007, A.N.H. returned to

live with Plaintiffs.  During the 2006-2007 school year, Plaintiffs failed all of her classes except

Keyboarding and French.

Between approximately June 28, 2007, and July 9, 2007, Dr. Steven B. Silverman, the

psychologist assigned as a result of the PINS filing, performed an evaluation of A.N.H.  In his

four-page single-spaced report, Dr. Silverman opined, in part, that A.N.H. was "angry and

impulsive and [was] at hi[gh]-risk for committing provocative and reckless acts that could lead

to self-injurious behavior," adding that the student's "anger and oppositionalism are likely signs

of an underlying depression and/or mood disorder."  (Dkt. No. 28, Attach. 2, at 16 [attaching

page "3" of Plfs.' Ex. F].)  While Dr. Silverman's report recommended, in part, "mandated . . .

family counseling," "further diagnostic clarification," and treatment from "a very active, direct

and firm therapist," it did not expressly recommend any school intervention.  A copy of Dr.

Silverman's evaluation was not sent to the District.

<h3 style="text-align:center">2.    The 2007-2008 School Year</h3>

At the beginning of the 2007-2008 school year, A.N.H. was enrolled in the District and

was considered to be in the tenth grade, but was taking ninth-grade-level classes.

<h3 style="text-align:center">a.    Four Winds</h3>

On September 12, 2007, A.N.H. was ordered by the Otsego Family Court to undergo a

30-day evaluation at Four Winds Psychiatric Facility in Saratoga Springs, New York, where she

was hospitalized for approximately 10 days.  Plaintiffs notified the District of A.N.H.'s

hospitalization at Four Winds.  The District's Guidance Counselor was informed of A.N.H.'s

admission to Four Winds, and that she would be receiving 10 hours of tutoring a week there.

Upon A.N.H.'s discharge from Four Winds, the District's Guidance Counselor was sent the Four Winds "School Services Discharge Report." The Discharge Report from Four Winds stated that, on September 26, 2007, A.N.H. was discharged from the hospital after a two-week stay. In addition, upon discharge, Plaintiffs received a one-page Discharge Summary from Four Winds. Plaintiffs did not give a copy of that one-page Discharge Summary to the District. However, on September 14, 2007, A.N.H.'s mother had signed a release permitting Four Winds to release A.N.H.'s record to the District.

In its Discharge Report, the Four Winds hospital staff advised the District's Guidance Counselor that A.N.H. had participated in the hospital's academic program from September 17, 2007, through September 25, 2007, for two hours per day in a class of five students. While at Four Winds, A.N.H. received instruction in math, global studies, science, English and physical education; in addition, some course-related activities were provided by the District. Regarding A.N.H.'s "[a]cademic [a]pplication," Four Winds' staff commented that A.N.H. showed "[c]onsistent application during classroom hours," that she was "[c]apable of working independently and asking questions when needed," that she "[b]enefited from individual help," and that, "in the absence of specific assignments, grade appropriate work was assigned." Regarding A.N.H.'s "[s]ocial [p]articipation," Four Winds' staff commented that A.N.H. "[g]ot along well with others in the structure of the classroom," and that she "[w]orked well in this highly structured, small group setting." Regarding A.N.H.'s "[o]utlook," Four Winds' staff commented that, "[w]ith improved health and continued application, [A.N.H.] should have little difficulty reentering the academic program," and that she would "continue to benefit from the emotional and academic supports present in her academic program." Finally, regarding

"[i]nformation and [s]uggestions," Four Winds' staff suggested, *inter alia*, "that the [District's Guidance Counselor] schedule weekly meetings for the first three to four weeks after [A.N.H.] returns to school and then evaluate the number of meetings that would be beneficial to her for the next prescribed period of time." The Discharge Report from Four Winds did not recommend a referral to the District's CSE, nor did it direct Plaintiffs to make a referral to the CSE.

At some point between September 26, 2007, and October 3, 2007, A.N.H. returned to the District's school. Upon doing so, A.N.H. met with the District's Guidance Counselor weekly in accordance with the hospital's recommendations. A.N.H.'s Guidance Counselor stated that he met with A.N.H. to discuss her adjustment upon returning to school, developments in her course schedule, and her fulfillment of graduation requirements. A.N.H.'s Guidance Counselor stated that A.N.H. did not discuss with him any difficulties she was having at school, with peers, or at home.

However, from October 3, 2007, through 10, 2007, A.N.H. received seven disciplinary referrals for such infractions as accumulating excessive detentions, cutting mandatory detention and multiple classes, and arriving late to school without an explanation. (Dkt. No. 29, at 45-50 [attaching page "2" of Def.'s Ex. 14.)

On or about October 23, 2007, A.N.H. had a running away incident, which also included a suicide attempt.

### b.     Brattleboro Retreat

On or about October 24, 2007, A.N.H. was hospitalized at Fox Hospital, released and taken to Brattleboro Retreat in Vermont. Upon A.N.H.'s admission to Brattleboro Retreat, A.N.H.'s parents notified the "attendance office" at the District of that admission (although the

District's Director of Special Education does not have any recollecting of learning that fact at the time).  (Dkt. No. 29, Attach. 5, at 30-31 [attaching pages "30" and "31" of transcript]; Dkt. No. 28, Attach. 4, at 30 [attaching page "30" of transcript].)

A.N.H. remained at Brattleboro Retreat for approximately 12 days.  In a two-page single-spaced psychological evaluation, the Brattleboro Retreat psychologist (who admittedly never interviewed A.N.H.) described A.N.H. as, in part, "someone with impulsivity, acting out problems or potential, and some difficulties with authority figures and externally imposed rules and standards." The psychologist also commented that, in part, "Further outpatient assessment. . . may be helpful to clarify the question of depression as she notes she suffers from, yet her MMPI-A profile reflected relatively little in the way of depressive symptoms."  The Brattleboro Retreat psychological evaluation was not given to the District.

A Discharge Summary was created by Brattleboro Retreat Health Care, but was not provided to the District until about January 8, 2008.  The Brattleboro Discharge Summary stated, in part, that A.N.H. had a history of self-injury (having done so on two other occasions), running away (having done so on four other occasions), and arguing with her parents, but that she typically did not argue with school personnel.  (A.N.H.'s mother testified that this was an accurate summary of A.N.H. at that time.)  In addition, the Discharge Summary stated, in part, that "[a]ccording to [A.N.H.'s] chart, [she] has a diagnosis of bipolar disorder."  It also stated, in part, that "[d]epressive symptoms evident were difficulty falling asleep and anhedonia."  Among the "Final Diagnoses" contained the in the Discharge Summary was an Axis I . . . Mood Disorder, not otherwise specified."  (According to the District's psychologist, depression falls under the category of a mood disorder.)  The Discharge Summary described A.N.H.'s prognosis

as "[g]uarded . . . [d]ue to suspicion of an evolving axis I diagnosis such as bipolar disorder or schizoaffective disorder." Regarding "[a]rrangements for [a]ftercare [s]ervices," the Discharge Summary stated, in part, that "[A.N.H.] has an appointment . . . for individual therapy," and that "[A.N.H.] and her family will meet with school staff to develop a plan for reentry and catching up with school work."

### c.    Bugbee Program

When A.N.H. returned from Brattleboro Retreat in November 2007, Plaintiffs requested she attend the District's alternative high school and she began attending the District's Bugbee Program ("Bugbee").  Bugbee is an off campus school where suspended high school students or students who require tutoring or are receiving a GED program, receive educational programming.  Plaintiffs made the decision to place A.N.H. in the Bugbee alternative school program, because Plaintiffs felt that she could not function in school and needed tutoring.  The District agreed to send A.N.H. to Bugbee for tutoring instead of attendance at the highschool. (At the time, the District offered in-school programming for A.N.H., in addition to the Bugbee tutorial she was to receive.)

A.N.H. began receiving tutoring at Bugbee in November of 2007.  She received tutoring two or three hours a day, for five days each week.  (Over the course of her attendance there, her tutoring was apparently increased to three or four hours per day.)  At Bugbee, A.N.H. received assistance in Math, English, Global and Social Studies.  A.N.H's tutor at Bugbee  (James Cimko) found A.N .H. to be a very industrious, good student, who stayed on task in most subjects and was a very good student in Math.  A.N.H. was relaxed, never disrespectful to the tutor or violent. Her academic abilities weres on grade level in most of her subjects and a little above grade level

in Math.  While A.N.H.s mother reported that A.N.H. was not doing her homework assignments and was having difficulty starting written projects in mid-November of 2007, her tutor at Bugbee testified that eventually A.N.H. started completing her homework and getting her written work done, albeit on a "last minute" basis.  At Bugbee, A.N.H. appeared very social and very typical at getting along well with her peers.  In addition to tutoring at Bugbee, the District also offered A.N.H. opportunities at the high school including after-school tutoring, an earth science lab, a global studies class with a preferred teacher, and participation in after-school activities.

At the end of the first quarter of the 2007-2008 school year, A.N.H. received the following grades: English–62, Global Studies–28, Earth Science–60, and Algebra–78.  At the end of the second quarter of the 2007-2008 school year, A.N.H. received the following grades: English–90, Earth Science–72, Earth Science Lab–78, and Algebra–92.

Even though A.N.H.'s grades improved during the second quarter of the 2007-2008 school year, Plaintiffs still did not place A.N.H. back in the regular school.  A.N.H. was frequently unprepared for classes.  When she was in the hallways, A.N.H. was observed laughing, smiling and joking with her friends.

Meanwhile, on or about November 13, 2007, Plaintiffs had referred A.N.H. for an assessment as a student who might have a disability.  Thereafter, the District sought consent from the Plaintiffs to evaluate A.N.H. and informed them of their due process rights.  The Plaintiffs were sent a packet of information which included all required due process information.  On December 14, 2007, A.N.H.'s mother consented to A.N.H.'s evaluation by the CSE.

d.    **District's Psychological Evaluation**

The November 2007 referral states that a report from A.N.H.'s last hospitalization would be sent to the District psychologist.  While that hospitalization report was not provided to the District's Psychologist (Diana Rutherford), when the referral was delivered to her at some point before December 14, 2007, it was hand delivered to her by A.N.H.'s mother on or about January 8, 2008, when they met (more than three weeks before the evaluation of the District's Psychologist was dated, on January 31, 2008).  (Dkt. No. 29, Attach. 2, at 12-13 [attaching pages "155" and "156" of transcript].)

At their meeting on or about January 8, 2008, A.N.H.'s mother told the District's Psychologist that she was concerned that A.N.H. was not developing healthy peer relationships.  A.N.H.'s mother informed the District's Psychologist about A.N.H.'s problems, and stated that A.N.H. wanted to be back in regular school but that A.N.H.'s mother was concerned that A.N.H. would not work independently.  A.N.H.'s mother stated that she did not want A.N.H. back in school until A.N.H. was "ready and willing to work and she was waiting for [A.N.H.] to prove that she was going to work to come back to school."

The District's Psychologist met with A.N.H. before administering a formal assessment of her.  At that meeting, A.N.H. advised the District's Psychologist that she was interested in being back in the regular school.  A.N.H. reported to the District's Psychologist that she had joined the ski team and took part in an extra-curricular activity.  While working with A.N.H., the District's Psychologist reviewed the copy of the Brattleboro Retreat Discharge Summary that was given to her by A.N.H.'s mother or about January 8, 2008.  The Brattleboro Retreat Discharge Summary did not contain any recommendation that A.N.H. be referred to the District's CSE but did suggest

that A.N.H. follow the PINS guidelines and that the family and school work on a re-entry plan.

The District's Psychologist performed a psycho-educational evaluation of A.N.H. in January, 2008.  Background information in the evaluation of the District's Psychologist came from a variety of sources including a Comprehensive Social History received from the Plaintiffs, interviews with teachers as well as the Brattleboro Retreat and Four Winds Reports.  In evaluating A.N.H., the District's Psychologist performed the Wechsler Intelligence Scale for Children (a cognitive assessment) and the Woodcock Johnson Test of Achievement.

The District's Psychologist did not administer tests to determine whether A.N.H. had problems with her peers or teachers, or whether A.N.H. was unhappy or depressed.  In addition, the District's Psychologist did not administer tests to gauge behavior problems, or administer a behavior-ratings scale.  Rather, to assess depression, the District's Psychologist used information she received from Brattleboro Retreat.  The District's Psychologist never requested the results of certain tests from Brattleborto Retreat (the BASC Depression Inventory, the MMPI, the Draw-A-Person Test, or Rotter Incomplete Sentences Blank).  (Dkt. No. 20, Attach. 2, at 92 [attaching page 235 of transcript].)

In her eight-page single-spaced evaluation dated January 31, 2008, the District's Psychologist stated that, regarding the Verbal Comprehension Index, A.N.H. scored in the average range.  Regarding the Perceptual Reasoning Index, she also scored in the average range.  Regarding the Working Memory Index, she scored in the high-average range.  Regarding the Processing Speed Index, she scored in the average range.  A.N.H. was assessed to have a full scale l.Q. of 101 which is average.  Regarding  Achievement Testing, A.N.H. was in the average range in Reading, Writing and Math.  Overall, A.N.H. essentially had the level of knowledge she

should have had by the tenth grade and was average compared to her age peer group.  However, the District's Psychologist also stated, in part, that "outside mental health factors appear to be causing a significant disruption in [A.N.H.'s] life within school . . . .  The CSE will need to determine to what extent [A.N.H.'s] mental health issues are impacting her educationally."  The District's Psychologist testified that, while A.N.H.'s achievement testing demonstrated that she was learning at a level that was average compared to that of her peer group, her grades were lower than the District's Psychologist would have expected.  (Dkt. No. 29, Attach. 2, at 105-106 [attaching pages "248" and "249" of transcript].)

Based on A.N.H.'s ability to learn and lack of disciplinary behaviors, the District's Psychologist did not find A.N.H needed a Functional Behavioral Assessment (although she testified that a Functional Behavioral Assessment should be performed when behavior impacts learning and education, and that A.N.H. did have behaviors that negatively impacted learning and education).  Moreover, encouraged by the fact that A.N.H. had improved her grades, joined an extra-curricular activity (where A.N.H. had said she had formed some relationships), followed through with tutoring, and said she wanted to go back to school, the District's Psychologist did not recommend that A.N.H. be classified as a student with a disabling condition.  Rather, the District's Psychologist recommended that A.N.H. be given opportunities for socialization, development of healthy connections, and be given the opportunity to come back to the high school, on a part-time basis, with supports.

### e. District's CSE Meeting in January 2008

On January 31, 2008, the District's CSE met regarding A.N.H.  A.N.H. attended the CSE meeting and signed in as "the victim."  The CSE spoke about the reasons for the referral, went

through A.N.H.'s history, reviewed the evaluation of the District's Psychologist, and discussed whether or not A.N.H. qualified as a student with a disability.

The CSE believed that the evaluation showed that A.N.H. was learning effectively and that her academic skills were "generally clustered around the middle of the average range," which is what the CSE expected based on her average l.Q. The CSE also believed (from the fact that every day after tutoring A.N.H. would come to school and socialize with her friends before and after school was over) that A.N.H. was able to "socialize very well, had friends, came to see them and also made contact with teachers that she knew." The CSE believed there was no indicia that A.N.H. had inappropriate relationships with teachers. As a result, the CSE determined that A.N.H. was not qualified for CSE services at that time. Although Plaintiffs had sought a classification, they "went along with" the CSE's determination because, "to the best of [their] ability, [Plaintiffs] believed that the [CSE] knew what the correct [determination] would be."

Because it was determined that A.N.H. did not qualify for classification, the CSE discussed interventions which should be put in place for A.N.H. through the general education environment to address concerns in the referral. The CSE did not find that A.N.H. had a generally pervasive mood of unhappiness or depression. The CSE recommended that A.N.H. be placed back in the regular school for one half of each day and that she continue to receive two hours of tutoring a day at Bugbee until she was able to return to school for the whole day. The CSE also recommended that A.N.H. have a contact person which could provide counseling and, as needed, support (as well as A.N.H.'s ability to leave class without consequences when she sought support from that contact person). A good portion of the CSE meeting on January 31,

2008, discussed the supports that could be put in place for A.N.H.

    While the District's CSE did not prepare what is properly called an Individualized Education Program ("IEP"), it prepared a document, on an IEP form, as a record of the meeting and an indication of the outcome of the meeting.  (Dkt. No. 28, Attach. 4, at 40 [attaching page "40" of transcript]; Dkt. No. 29, at 72-79 [Def.'s Ex. 23].)  That document did not spell out the supports that the District was going to provide A.N.H.  (*Id*.)

### f.    Return to District's High School

    After the CSE meeting in January, 2008, A.N .H. returned to the public high school for half the day and to Bugbee for tutorial.  A.N.H.'s return to regular school in February 2008 only lasted three days.  During that three day time period, she was seen by the District Guidance Counselor to be in the hallway with a group of peers, and seemed to him "to be fine."  However, toward the end of the three day time period, A.N.H. informed her parents that she "couldn't handle" being in the high school and that she was "too uncomfortable," because "everybody knew she had been at a mental hospital."  (Dkt. No. 29, Attach. 5, at 50-51 [attaching pages "516" and "517" of transcript].)  In addition, A.N.H. had a "very volatile relationship" with her boyfriend, and "would often have very depressed or very angry episodes following something with him."  (Dkt. No. 29, Attach. 5, at 51 [attaching page "517" of transcript].)

    At the end of that three day time period, the District's Guidance Counselor was informed by A.N.H.'s father that A.N.H. had a telephone conversation with her boyfriend the night before that did not go well.  The District's Guidance Counselor was informed by A.N.H.'s father that this phone conversation had made A.N.H. so upset that she was not able to return to the high

school.  As a result, A.N.H.'s father decided or requested that A.N.H. leave regular high school and return to Bugbee; following this conversation, the District did not require additional medical documentation from Plaintiffs.  (Dkt. No. 29, Attach. 3, at 18-19 [attaching pages "308" and "309" of transcript]; Dkt. No. 29, at 80 [Def.'s Ex. 24]; Dkt. No. 29, Attach. 5, at 51-53 [attaching pages "517" through "519" of transcript].)

**g.     Return to Bugbee Program**

A.N.H. stayed in the Bugbee program in the spring of 2008, where she received tutoring two hours a day, for five days each week.

On March 6 and 7, 2008, A.N.H.'s mother sent two email messages to an employee of the District (Nancy Osborn) requesting her help in persuading an employee of Bugbee (Mr. Cimko) to permit A.N.H. more time at Bugbee (letting her arrive there before 10:30 a.m., and not dismissing her as punishment for tardiness after breaks).  (Dkt. No. 29, Attach. 5, at 55 [attaching page "521" of transcript]; Dkt. No. 28, Attach. 2, at 37-38 [Plfs.'s Exs. P, Q and R].)

On March 20, 2008, A.N.H.'s mother sent an email message to a teacher (with a copy to two other District employees, including the District Guidance Counselor) stating as follows:

> [My husband] and I have tried to get [A.N.H.] up and out for school, but she is collapsing into depression.  We're now trying to get her a place in a hospital or other therapeutic environment.  You've been really supportive and helpful–at this point all we can say is let her receive the consequences of not showing up for her labs and make-up tests.

During the spring of 2008, Plaintiffs did not make a re-referral to the CSE.  Rather, sometime in March of 2008, Plaintiffs began researching alternative programs and learned of the Family Foundation.  On March 28, 2008, Plaintiffs went for an interview at the Family Foundation.

18

On April 21, 2008, A.N.H.'s mother sent an email message to the District Guidance Counselor, stating as follows:

> As I might have mentioned to you earlier, we are working on enrolling [A.N.H.] at the Family Foundation School in Hancock, NY. We'd like [her] to go willingly because we believe that the school has a program that can help her. She has said that she would like to go to BOCES, but doesn't she need [m]ore credits? Could you just confirm for us that BOCES is not an option?

(Dkt. No. 28, Attach. 2, at 41 [Plfs.' Ex. U]; Dkt. No. 29, Attach. 3, at 22 [attaching page "313" of transcript].) The District Guidance Counselor responded that A.N.H. had not earned enough credits to attend the BOCES program. (Dkt. No. 29, Attach. 5, at 58 [attaching page "525" of transcript].)

On April 28, 2008, A.N.H.'s mother sent another email message the District Guidance Counselor, asking him to send a copy of A.N.H.'s transcript to the Family Foundation, and stating, "We are hoping to enroll her this week." (Dkt. No. 28, Attach. 2, at 42 [Plfs.' Ex. V]; Dkt. No. 29, Attach. 3, at 23 [attaching page "314" of transcript].) The Counselor sent A.N.H.'s transcript to the Family Foundation. (A.N.H.'s transcripts indicate that she earned two academic credits at Bugbee, the only classes having been passed by her during the 2007-2008 school year being Global Studies 9R and Algebra.)

At no time before A.N.H.'s attendance at the Family Foundation did Plaintiffs notify the District in writing that they would be seeking tuition reimbursement for that placement. (Dkt. No. 28, Attach. 2, at 41-42 [Plfs.' Exs. U and V]; Dkt. No. 29, Attach. 3, at 22-23 [attaching pages "313" and "314" of transcript]; Dkt. No. 29, Attach. 6, at 54 [attaching page "616" of transcript].)

### h.    Attendance at Family Foundation

On May 2, 2008, A.N.H. began attending the Family Foundation.  The Family Foundation is a private, therapeutic, college-prep boarding school. The school's mission is to provide a rigorous middle school and high school academic curriculum to their students as well as providing therapeutic support and intervention to help students overcome difficulties that interfere with their academic success and daily living.  The Family Foundation provides a New York State Regents Curriculum, and is in good standing with the New York State Department of Regents.

The Family Foundation is registered as a therapeutic boarding school with the New York State Board of Regents.  The Family Foundation is also accredited by the Middle States Association of Colleges and Secondary Schools.  (The Middle States Association of Colleges and Secondary Schools is an accreditation body that substantiates that an educational program meets accepted standards.)  The Family Foundation is also accredited by the Joint Commission, which is the accreditation body for health care organizations. (The Family Foundation is about the fourth or fifth therapeutic boarding school in the country to achieve that accreditation.)

While the Family Foundation's Vice President for External Relations and Director of Admissions (Jeffrey Brain) testified that the Family Foundation is not a "Special Ed[ucation] school," he also testified that the Family Foundation makes "accommodat[ions]" for, and provides therapeutic counseling to, students.  (Dkt. No. 29, Attach. 4, at 26-27, 45 [attaching pages "380," "381," and "399" of transcript].)  He explained that many, and maybe most, of the Family Foundation's students have some difficulty learning, and part of its academic design is to "accommodate those difficulties, to reteach [the students] how to be . . . effective learner[s]."

(Dkt. No. 29, Attach. 4, at 27 [attaching page "381" of transcript].)[2]  For example, the Family Foundation is in session 50 weeks a year and teachers are available outside of the classroom environment, including nights and weekends. (*Id.*)  The Family Foundation offers smaller class sizes of on average 12 students each (with an overall student-teacher ratio of 8-1), an instructional classroom structure that allows for teacher tutoring and teacher remediation within the classroom, and "a lot of" peer tutoring.  (*Id.*; *see also* Dkt. No. 28, Attach. 2, at 80 [Plfs.' Ex. XX)  The Family Foundation also offers therapeutic counseling, including support group counseling, one-on-one counseling, and counseling specified to issues such as anger management, grief and loss, and body image. (Dkt. No. 29, Attach. 4, at 28 [attaching page "382" of transcript].)  The Family Foundation is based on the 12-step program and encourages spirituality as part of a student's healing and recovery work.  (The 12-step program is based on putting one's trust and faith in a higher being and has a religious basis.)[3]

Between ten and fifteen percent of the students at the Family Foundation have their tuition paid for by school districts. (Dkt. No. 29, Attach. 4, at 11 [page "365" of transcript].)  Most of this funding, if not all of it, is the result of a due process hearing, rather than being volitional.  (Dkt. No. 29, Attach. 4, at 45 [page "399" of transcript].)

On or about May 8, 2008, A.N.H.'s mother informed the District Guidance Counselor that the Family Foundation had asked A.N.H. to leave because she was pregnant and that A.N.H.

---

[2]    Approximately half of the students at the Family Foundation have alcohol or substance abuse problems, and the other half have a wide variety of issues including cutting, sexually acting out, running away, etc.

[3]    The Family Foundation has a statue of St. Joseph as well as a statue of the Virgin Mary on the grounds.  All students have to attend non-denominational services of their choice.

would be back at Bugbee.  A.N.H. then returned to the District and attended Bugbee for two hours a day for a short period of time.

### i.    Second Visit to Brattleboro Retreat

On or about May 22, 2008, A.N.H. was placed at Brattleboro Retreat by Judge's Order. The District was aware that A.N.H. was placed at Brattleboro Retreat.  (Dkt. No. 29, Attach. 5, at 30-31 [attaching pages "496" and "497" of transcript].) On or about May 30, 2008, Bratteboro issued a Discharge Summary; however, that Discharge Summary was never given to the District. The three-page singled-spaced Discharge Summary does not state that A.N.H. should be referred to the CSE.  (Dkt. No. 28, Attach. 2, at 45-48 [ Plfs.' Ex. Y]; Dkt. No. 28, Attach. 4, at 51 [attaching page "51" of transcript].)  However, that Discharge Summary states, in part, that A.N.H. "has a history of depression," self-reported "increasing signs and symptoms of depression," "[d]epressive symptoms at the time of admission," and a diagnosis of "[m]ajor [d]epressive [d]isorder" and "[i]nadequate supports."  (Dkt. No. 28, Attach. 2, at 45-48 [Plfs.' Ex. Y].)

After the discharge from the Brattleboro Retreat, A.N.H. returned to Bugbee and earned two academic credits.

### j.    Re-Enrollment at Family Foundation

At the end of June 2008, Plaintiffs took A.N.H. to the Lund Family Center in Burlington, Vermont, where she had a miscarriage on or about July 4, 2008.  A.N.H. remained at the Lund Family Center for approximately two weeks, following her miscarriage.  According to A.N.H.'s mother, A.N.H. was angry and lost when she returned home from the Lund Family Center.

On July 21, 2008, Plaintiffs returned A.N.H. to the Family Foundation, where they re-

enrolled her.  (Dkt. No. 29, Attach. 5, at 62, 64 [attaching pages "529" and "530" of transcript]; Dkt. No. 28, Attach. 2, at 49 [Plfs.'s Ex. AA].)  Before doing so, Plaintiffs did not inform the District that they were again placing her in the Family Foundation and would be seeking from the District tuition reimbursement, because they were focusing on A.N.H., whom they felt was "in a really grave way" and an "emergency" situation.  (Dkt. No. 29, Attach. 6, at 59 [attaching page "621" of transcript]; Dkt. No. 29, Attach. 5, at 64-65 [attaching pages "530" and "531" of transcript].)

### 3. The 2008-2009 School Year

#### a. Request for Tuition Reimbursement

At some point in August 2008, A.N.H.'s father had two phone conversations with the District's Interim Business Officer (Ron Whipple) about "some tuition assistance" with regard to the Family Foundation.  In the second conversation, the District's Interim Business Officer told A.N.H.'s father that the District could not help Plaintiffs with tuition assistance to the Family Foundation, because A.N.H. was not classified, and the Family Foundation was not on the Commissioner's approved list of special education schools.

Following the phone calls in August of 2008, Plaintiffs had a meeting with the District's Interim Business Officer and the District's Director of Special Education (Gary Koutnik), in order for Plaintiffs to renew their request for tuition assistance with regard to the Family Foundation.  At that meeting, Plaintiffs were again informed that the District could not offer tuition assistance, because A.N.H. was not classified, and the Family Foundation was not on the Commissioner's approved list of special education schools.

23

The District's Director of Special Education testified that, "to the best of [his] knowledge," Plaintiffs never notified the District that A.N.H. would be placed in a private school for the 2008-2009 school year, that a "FAPE was at issue," and that Plaintiffs would seek tuition reimbursement for that placement. (Dkt. No. 28, Attach. 4, at 48 [attaching page "48" of transcript].) However, it is undisputed that A.N.H.'s father informed the District's Interim Business Officer in August of 2008 that Plaintiffs had enrolled A.N.H. in the Family Foundation (a private school). It is also undisputed that, on August 25, 2008, A.N.H.'s mother informed the District Guidance Counselor in writing that A.N.H. had been enrolled in the Family Foundation. (Dkt. No. 28, Attach. 2, at 49 [ Plfs.'s Ex. AA].) Finally, it is undisputed that A.N.H.'s mother personally informed the District's Director of Special Education (in response to his statement that A.N.H.'s right to a FAPE did not mean "[she] can have any education [she] want[s]") that Plaintiffs "would be seeking the advice of a lawyer," and that the District's Director of Special Education said that this was information that "the superintendent would need to know." (Dkt. No. 29, Attach. 5, at 65-68 [attaching pages "531" through "534" of transcript].)

Following this meeting with Plaintiffs, the District did not reconvene the CSE to determine if A.N.H. should now be classified as a student with a disability.

When Plaintiffs spoke with District representatives in August of 2008 to request that the District pay for A.N.H.'s tuition at the Family Foundation, Plaintiffs were residing at their second home, outside of the District.[4] However, Plaintiffs did not request reimbursement for the brief

---

[4]     Between June 30, 2008, and September 1, 2008, Plaintiffs lived at their second home, which was in Bainbridge, New York, a location within the Bainbridge Central School District; at the time, Plaintiffs lived there only for the summer, with the intention of moving back to the District in September 2008, which they did. (Dkt. No. 29, Attach. 5, at 42-43 [attaching pages "508" and "509" of transcript]; Dkt. No. 29, Attach. 6, at 5-7 [attaching pages "567"

time that they were admittedly residing outside of the District.  (Dkt. No. 29, Attach. 6, at 5 [attaching page "567" of transcript]; Dkt. No. 29, Attach. 5, at 65 [attaching page "531" of transcript]; Dkt. No. 29, Attach. 5, at 45 [attaching page "511" of transcript].)

**b.     Hancock Central School District IESP**

After A.N.H. again began attending the Family Foundation, Plaintiffs made a referral to the Hancock Central School District ("Hancock"), the public school district in which Family Foundation is located.  By letter dated October 8, 2008, Plaintiffs requested that Hancock conduct an evaluation of A.N.H.  The District was not sent a copy of the Plaintiffs' referral letter of October 8, 2008.  In addition, Plaintiffs filled out a Hancock CSE Referral Form, a copy of which was also not sent to the District.

Following the referral to Hancock, its psychologist, Dr. Jason Hans, completed an evaluation of A.N.H.  Dr. Hans performed a "Confidential Psycho-Educational Report" dated January 18, 2009.  That report was not sent to the District until March of 2009.  One of the self-report scales administered to A.N.H. by Dr. Hans reported that her depression was in the "normal range of symptom endorsement."  (Dkt. No. 29, Attach. 1, at 10 [attaching page "9" of Def.'s Ex. 26]; Dkt. No. 29, Attach. 2, at 58 [attaching page "201" of transcript].) However, one of the teacher-rating scales administered by Dr. Hans reported that A.N.H.'s depression scale was "[c]linically [s]ignificant," and that one of A.N.H.'s teachers had stated that she was "withdrawn, pessimistic, and/or sad."  (Dkt. No. 29, Attach. 1, at 4-5 [attaching pages "3" and "4" of Def.'s Ex. 26]; Dkt. No. 29, Attach. 2, at 57-58 [attaching pages "200" and "201" of

---

through "569" of transcript].)  During that summer, Plaintiffs never enrolled A.N.H. in the Bainbridge Schools.

transcript].)

In January 2009, Hancock's CSE met A.N.H., found A.N.H. to be classifiable as a student with "Emotional Disturbance" and created an Individualized Education Services Plan ("IESP") for her.  (An IESP "is for a student who is parentally placed at a private school . . . .")  The IESP recommends that A.N.H. receive counseling two times a week, 60 minutes per group session (including group counseling for adoptees).  While the IESP created by Hancock does not expressly recommend that A.N.H. be placed in a residential setting, an IESP "is for a student who is parentally placed at a private school," and the Hancock IESP expressly acknowledges that A.N.H. had been placed at the Family Foundation (which is a private *boarding* school).  (Dkt. No. 28, Attach. 4, 46-48 [attaching pages "46" through "48" of transcript]; Dkt. No. 29, Attach. 1, at 14-23 [Def.'s Ex. 27].)  The IESP was never implemented.  Although Hancock recommended two hours of group counseling a week at the Family Foundation, the District was never billed for any services that may have been provided to A.N.H. during the 2008-2009 school year.

### c. Plaintiffs' Due Process Complaint Against District

In February of 2009, Plaintiffs filed a Due Process Complaint against the District stating, in part, that the District had denied A.N.H. a free appropriate public education.  The Complaint requested, in part, that the District classify A.N.H. as a student with a disability, provide her with appropriate services, and reimburse Plaintiffs for tuition at the Family Foundation.

By letter dated March 13, 2009, the District responded to Plaintiffs' Due Process Complaint Notice maintaining that the District, both procedurally and substantively, had met all of its legal obligations to the student and Plaintiffs and denied that Plaintiffs were entitled to any

of their proposed solutions.

The parties attended a Resolution Session in March 2009, and, as part of that Resolution Session outcome, Plaintiffs re-referred A.N.H. to the District's CSE. Following a resolution session on March 23, 2009, Plaintiffs referred A.N.H. to the District's CSE. As part of that process, on or about April 7, 2009, Plaintiffs filled out a Parent Questionnaire and a Comprehensive Social History. In that Comprehensive Social History, A.N.H.'s father requested that the District "help" her remain at the Family Foundation for the 2008-2009 school year.

### d.    District's Visits to Family Foundation

On April 8, 2009, two District's representatives (the District's Psychologist and the District's Director of Special Education) visited the Family Foundation to talk to A.N.H. and her counselor there, Marcia Ertola. The District representatives were told that one of the first things students do in the morning at the Family Foundation is attend a morning meeting that involves "say[ing] a morning prayer[,] . . . sing[ing] a song[,] and . . . [celebrating] birthdays." The District's Director of Special Education was told by Ms. Ertola that A.N.H. was at the Family Foundation because of sexual issues, body image issues, co-dependency and anger. Ms. Ertola advised the District's Director of Special Education that the Family Foundation tries to steer students away from "dependency" on therapeutic advisors, and toward "family groups" as defined by the Family Foundation (which are not comprised of the student's biological family). (Dkt. No. 28, Attach. 4, at 58-59 [attaching pages "58" and "59" of transcript]; Dkt. No. 29, Attach. 2, at 66-67 [attaching pages "209" and "210" of transcript]; Dkt. No. 29, Attach. 1, at 32 [Def.'s Ex. 32].) As the District's Psychologist understood how Ms. Ertola was referring to "family," the "kids are all broken up into . . . different dorms, . . . and A.N.H.'s family, her

support groups, was that group that lived in her dorm." (Dkt. No. 29, Attach. 2, at 66-67

[attaching pages "209" and "210" of transcript].)  During the visit, A.N.H. told the District

representatives that she believed she was going to finish her schooling at the Family Foundation,

including taking an additional year to get a Regent's diploma, thereby staying at the Family

Foundation until June 2011.  A.N.H. had only spent one overnight with her parents after being at

the Family Foundation for almost a year.  While A.N.H. had been at the Family Foundation

program for 15 to 16 months, she did not yet have a transition plan in place for her exit

therefrom.

On July 1, 2009, Timothy Gracy became the District's new Director of Special Education.

During his first week in that position, he visited the Family Foundation along with the District's

Superintendent and met with the Director of the Family Foundation. When those two District

representatives asked the Director of the Family Foundation what Special Education services

were available at the Family Foundation, the Director of the Family Foundation "made it clear"

to the representatives that–other than the 12-step process–no such services were available.  (Dkt.

28, Attach. 4, at 115 [attaching page "115" of transcript].)  A number of the instructors at the

Family Foundation are not certified teachers.  The consulting psychiatrist at the Family

Foundation (Dr. Merrill Manley), who is only there periodically, did not conduct any

psychotherapy with A.N.H.   According to the Director of the Family Foundation, the Family

Foundation did not provide to A.N.H. any ongoing psychological counseling specific to her

diagnosis of a bipolar disorder, because the Family Foundation's staff psychologist (Dr. Mark

Vogel) did not diagnose her as suffering from that disorder.  (Dkt. No. 29, Attach. 4, at 70-71

[attaching pages "424" and "425" of transcript].)  One of the "accommodations" provided by the

Family Foundation is peer tutoring, conducted by an older student (who has a mastery of the subject area) tutoring a younger student in that class. (Dkt. No. 29, Attach. 4, at 27, 56 [attaching pages "381" and "410" of transcript].) The support groups offered by the Family Foundation are not uniformly monitored by licensed therapists. (Dkt. No. 29, Attach. 4, at 57 [attaching page "411" transcript].) However, A.N.H.'s family group leader (Ms. Ertola) had a master's degree in education, was a clinical social worker, and was a certified school counselor. (Dkt. No. 29, Attach. 4, at 29, 63-64 [attaching pages "383," "417," and "418" of transcript].) A.N.H.'s family group is comprised of about five or six students and meets weekly.

In addition, at the Family Foundation, A.N.H. attended a "grief and loss survivor group" once a week, because of her lost pregnancy. (Dkt. No. 29, Attach. 4, at 40-41 [attaching pages "394" and "395" of transcript].)[5] That group, which was comprised of about eight students, was run by the Family Foundation's Vice President for External Relations and Director of Admissions (Jeffrey Brain). Although Mr. Brain is not a New York State Certified Clinical Psychologist, he has a Master's degree in Clinical Psychology and a Bachelor's degree in Psychology. While at Family Foundation, A.N.H. also participated in an adoption group that met twice per month, and was run by a drug and alcohol counselor who has an associate's degree.

All of the Family Foundation's counselors were supervised by the Director of Counseling, who was a licensed clinical social worker. In addition, ANH has received

---

[5]    Upon information and belief, A.N.H. became pregnant prior to her admission to the Family Foundation, where she tested positive in May 2008 and was asked to leave. During her initial placement at the Family Foundation, she had not yet experienced the "loss" about which she was later to receive counseling.

individual psychotherapeutic counseling from the Director of Counseling.  (Dkt. No. 29, Attach. 4, at 31 [attaching pages "385" of transcript].)

The Family Foundation's Vice President for External Relations and Director of Admissions testified that ANH has progressed "very well" within her counseling groups.  (Dkt. No. 29, Attach. 4, at 31 [attaching page "385" of transcript].)  He testified that, although A.N.H. "reported significant levels of depression six months into the program" (in December 2008), she has become significantly more emotionally stabilized since her start at the Family Foundation.  (Dkt. No. 29, Attach. 4, at 32 [attaching page "386" of transcript].)  He also testified that  "[w]e have seen a lot of growth and maturity and stabilization in [A.N.H.'s] emotional regulation, far less depressed, less anxious, much more capable of managing the struggles and difficulties of life." (*Id*.)  For example, he testified that, in her "grief and loss survivor group," A.N.H. had, "through some exercises," "very recently come to a point of almost closure" regarding that event.  (Dkt. No. 29, Attach. 4, at 100-101 [attaching page "454" and "455" of transcript].)

Moreover, the District's Director of Special Education (Gary Koutnik) noted (following a visit to the Family Foundation) that A.N.H.'s counselor (Marcia Ertola) informed them that, through counseling, A.N.H. has, *inter alia*, "give[n] struggling with the program," "move[d] [past]" her "[b]ody image" issues (stemming from comparing herself to others), improved in dealing with her "[a]nger issues," and become less withdrawn emotionally and more "connect[ed] . . . with [her] peers."  (Dkt. No. 29, Attach. 1, at 31, 32 [Def.'s Ex. 32].)

At a Family Foundation lunch, students get up to publicly talk about their progress, their concerns, successes and failures and is referred to as "table talk."  During "table talk," the entire group at lunch focuses on the one student who is presenting. On one of the days that the District

representatives were at the Family Foundation, A.N.H. stood up in front of her entire group, was asked to talk about her progress and thereafter her peers reflected on A.N.H.'s progress and gave feedback.  The District representatives observed one student being forced to sit in a corner with his back to the group.  Table talk, which ranges from academic issues to social interaction, peer relationships and family relationships, is not monitored by a licensed therapist but is an integral part of an AA support group.  People "credentialed" in a 12-step program are those who have overcome these types of issues themselves.  A.N.H. described her therapy as being in large groups and having opportunities to meet with peers.

At the Family Foundation, A.N.H. was enrolled in typical core classes for her grade level.  All of ANH's classes have been Regents-level courses.  In the Fall of 2008, A.N.H. took five academic subjects and received the following final grades: Earth Science–86, English 9–91, Geometry A–75, Global II–74, and Spanish I–84.  She failed Global II, not receiving credit for the class.  (The Family Foundation requires a passing grade of 75, which is more stringent than the District's passing grade of 65.)  In the Spring of 2009, A.N.H. took five academic subjects and received the following final grades: Biology A–77, English 10–83, Geometry B–69, Global II–78, and Spanish I–85.  She failed the final exam in Global II.  In addition, she failed Geometry B, not receiving credit for the class.  In February 2009, A.N.H. was failing Geometry B.  The Family Foundation's Vice President for External Relations and Director of Admissions testified that he did not know what specific supports were put in place to assist her in Geometry, because he was not her Geometry teacher.  (Dkt. No. 29, Attach. 4, at 50-52 [attaching pages "404" through "406" of transcript].)

**e.      District's CSE Meeting in April 2009 and Its IEP**

31

Meanwhile, a District CSE meeting regarding A.N.H. took place on April 22, 2009. There were representatives of BOCES at the CSE meeting.

At that meeting, the CSE went through A.N.H.'s social history, listened to parental input, reviewed evaluations of A.N.H., entered into a discussion about the records received since the CSE last met about A.N.H. and developed comprehensive present levels to be placed in an IEP. After discussion, the CSE agreed to classify A.N.H. as a child with an emotional disturbance. The CSE agreed that classification was appropriate, because it was "very clear that there is a history (long term) of depressive acts and self-destructive behaviors." (Dkt. No. 28, Attach. 4, at 66 [attaching page "66" of transcript]; Dkt. No. 29, Attach. 1, at 49-50 [Def.'s Ex. 36].) The District's Director of Special Education testified that the CSE's conclusion was different in April 2009 than in January 2008, because the CSE had "a lot more" information in April 2009, some of which "was only recently provided to the . . . District." (Dkt. No. 28, Attach. 4, at 66 [attaching page "66" of transcript].) The CSE discussed the continuum of services available for A.N.H. as a classified student including programs at its high school and programs offered through BOCES. The CSE concluded that bringing A.N.H. back to the District's high school, in a general education setting, would not work. The District's Psychologist testified that CSE reached this conclusion because A.N.H. had been out of the District's high school for a significant period of time, and bringing her back to the District's high school at that point seemed to move too quickly from a residential placement to the District's high school. (Dkt. No. 29, Attach. 1, at 75-76 [attaching pages "218" and "219" of transcript]; Dkt. No. 29, Attach. 1, at 52-53 [Def.'s Ex. 36].)

At the meeting, the CSE recommended that A.N.H. be placed in an Adolescent Day

Treatment Program at the Greater Binghamton Health Center beginning May 1, 2009.  That

placement has a day treatment program along with a school component utilizing certified

teachers, providing its students a Regent's curriculum along with very intensive therapeutic

services.  These therapeutic services at the Greater Binghamton Health Center are provided by

social workers, psychologists. and psychiatrists who work with the program and with whom the

students establish regular relationships.  The District's Director of Special Education testified

that Plaintiffs expressed a willingness to investigate the program, but requested that A.N.H. not

be asked to participate in the interview at the Greater Binghamton Health Center.  (Dkt. No. 28,

Attach. 4, at 68 [attaching page "68" of transcript]; Dkt. No. 29, Attach. 1, at 52-53 [Def.'s Ex.

36].)

An IEP was created for A.N.H. that specifically recommended placement in the

Adolescent Day Treatment Program at the Greater Binghamton Health Center beginning May 1,

2009. The IEP recommended that A.N.H. attend the Adolescent Day Treatment Program for the

remainder of the 2008-2009 school year and the 2009-2010 school year.  Plaintiffs did not, at

that point, question the anecdotal information contained in the April 22, 2009, IEP nor did they

ever question the appropriateness of the goals set forth therein.  Moreover, Plaintiffs did not, at

that point, say to the CSE that they were going to continue to enroll A.N.H. at the Family

Foundation, that they were rejecting the IEP, and that they were going to sue the District for

tuition reimbursement, because they were willing to consider the Adolescent Day Treatment

Program.  (Dkt. No. 29, Attach. 6, at 71 [attaching page "633" of transcript]; Dkt. No. 29,

Attach. 2, at 77 [attaching page "220" of transcript]; Dkt. No. 28, Attach. 4, at 68 [attaching page

"68" of transcript]; Dkt. No. 29, Attach. 1, at 52-53 [Def.'s Ex. 36].)

On May 4, 2009, A.N.H.'s father sent an email message to the District's Director of

Special Education, stating as follows:

> As per your and CSE recommendation, [A.N.H.'s mother] and I visited
> Mike Smith at Adolescent Day Treatment program in Binghamton this
> past Thursday, April 30.
>
> We were highly impressed with Mike Smith, as well as the program and
> the facilities.  However, we feel the program does not meet [A.N.H.'s]
> needs at this time.  Therefore, can you please advise as to the next action
> in this matter[?]

(Dkt. No. 28, Attach. 2, at 70 [Plfs.' Ex. NN]; Dkt. No. 28, Attach. 4, at 71 [attaching page "71"

of transcript].)  As a result, the District Director of Special Education agreed to send as much

information as he could regarding residential programs that might be appropriate so that

Plaintiffs could "run with it."  (Dkt. No. 28, Attach. 4, at 71 [attaching page "71" of transcript].)

On or about May 12, 2009, the District's Director of Special Education sent Plaintiffs a

list of residential programs from the Commissioner's approved list of residential programs. That

list included residential facilities for 17-year-old girls with emotional disturbances.

### f.     District's CSE Meeting in June 2009

A.N.H.'s mother believes that, by June 4, 2009, Plaintiffs had visited two other schools

(the House of the Good Shepherd in Utica, and St. Ann's in Albany).  (Dkt. No. 29, Attach. 5, at

77-79 [attaching pages "543" through "545" of transcript].)  However, Plaintiffs had trouble

understanding precisely what services A.N.H. might be offered at both because Plaintiffs did not

have a referral there from the District.  (*Id.*)

On June 4, 2009, the District's CSE reconvened.  At that meeting, Plaintiffs expressed

dissatisfaction with the programs offered by the District.  For example, Plaintiffs expressed their

feeling that the academics at the Adolescent Day Treatment Program at the Greater Binghamton

Health Center were not "rigorous" enough for A.N.H.  (Dkt. No. 28, Attach. 2, at 71 [Plfs.' Ex. OO]; Dkt. No. 29, Attach. 6, at 73 [attaching page "635" of transcript].)  As a result, the CSE agreed to table the issue and continue to investigate residential placements for A.N.H.

On or about June 19, 2009, the District's Director of Special Education sent Plaintiffs an additional list of four schools after he contacted an employee of the State Education Department (Roland Smiley) regarding A.N.H. and her specific profile.

### 4. The 2009-2010 School Year

On August 5, 2009, the CSE reconvened.  By the time the CSE reconvened on August 5, 2009, it was "shared with" the District's Director of Special Education that the Greater Binghamton Health Center "wasn't appropriate" for A.N.H., which was a decision that he "tended to agree with" based on "what [he] saw as some of A.N.H.'s needs."  (Dkt. No. 28, Attach. 4, at 123-27 [attaching pages "123" through "127" of transcript].)  Indeed, at the meeting on August 5, 2009, the entire CSE agreed with that determination.  (Dkt. No. 29, Attach. 2, at 118 [attaching page "261" of transcript].)

In addition, at the meeting on August 5, 2009, Plaintiffs advised the CSE that they had visited at least two schools (other than the Adolescent Day Treatment Program at the Greater Binghamton Health Center), which they felt were also not appropriate for A.N.H.  (Dkt. No. 28, Attach. 4, at 127 [attaching page "127" of transcript]; Dkt. No. 29, Attach. 2, at 81 [attaching page "224" of transcript]; Dkt. No. 29, Attach. 1, at 76-77 [Def.'s Ex. 38].)  In addition, Plaintiffs advised the CSE that they were informed by a third school they had contacted that the school did not offer services related to eating disorders (or perhaps did not even accept students with such disorders).  (Dkt. No. 29, Attach. 6, at 74-75 [attaching pages "636" and "637" of

transcript]; Dkt. No. 29, Attach. 1, at 65 [Def.'s Ex. 38]; Dkt. No. 28, Attach. 4, at 132-133

[attaching pages "132" and "133" of transcript].)[6]

The CSE agreed to continue looking for an appropriate residential program for A.N.H.

(Dkt. No. 28, Attach. 4, at 127 [attaching page "127" of transcript]; Dkt. No. 29, Attach. 2, at 81-

82 [attaching pages "224" and "225" of transcript]; Dkt. No. 29, Attach. 1, at 65 [Def.'s Ex. 38].)

The District told Plaintiffs that it would be willing to send A.N.H. to any residential program on

the New York State Commissioner's list of approved schools.  Moreover, the District also told

Plaintiffs that, once (in the first instance) the State placements had been exhausted, the CSE

could go outside of the State to find a residential placement for A.N.H.

Plaintiffs asked the CSE to consider placing A.N.H. at the Family Foundation because

they claimed that the Family Foundation was the best place for A.N.H., and that she should be

there for two more years.  Plaintiffs specifically requested that the District pay for A.N.H.'s

placement at the Family Foundation.  The CSE stated, in part, that the Family Foundation did not

have special education programs (such as a program for cognitive disabilities), that not all of the

teachers at the Family Foundation are certified teachers, and that the Family Foundation was not

on the New York State Commissioner's list of approved schools.  (Dkt. No. 29, Attach. 1, at 65,

67-68 [Def.'s Ex. 38].)

The District's CSE developed an IEP stating that, in part, A.N.H. "needs a safe,

_____

[6]        While A.N.H. has never been diagnosed as anorexic or bulimic, she has
participated in a food counseling group at the Family Foundation.  (Dkt. No. 29, Attach. 6, at 75
[attaching page "637" of transcript].)  Moreover, while the District has never received any
diagnosis that states A.N.H. has an eating disorder, two IEPs developed by the District both
reflect that "[b]ody image issues are significant for [A.N.H.]."  (Dkt. No. 29, Attach. 1, at 58
[attaching page "5" of Def.'s Ex. 37]; Dkt. No. 29, Attach. 1, at 73 [attaching page "5" of Def.'s
Ex. 39].)

structured, positive environment in which to access and use her academic skills in the Regents curriculum."  (Dkt. No. 29, Attach. 1, at 72 [attaching page "4" of Def.'s Ex. 39].)  The IEP also stated, in part, that ANH needed counseling services.  The IEP offered A.N.H. a "[r]esidential [p]lacement" at a "[l]ocation" that was "[n]ot [s]pecified" but was any one of the "[a]pproved in-State private schools."  (Dkt. No. 29, Attach. 1, at 76 [attaching page "8" of Def.'s Ex. 39].) While the District provided Plaintiffs with a list of a few residential schools, it did not make any referrals to any of the schools.

Neither at the end of the CSE meeting nor during the week after the CSE meeting did Plaintiffs inform the CSE that they were rejecting the residential placements offered by the District, that A.N.H. would continue to attend the Family Foundation, and that they would pursue tuition reimbursement, because they were still open to an appropriate suggestion for another placement besides the Family Foundation. (Dkt. No. 29, Attach. 6, at 77-78 [attaching pages "639" and "640" of transcript].)

The week after the CSE concluded, the District's Director of Special Education went on a planned one-week vacation.  He testified that, after he returned from that vacation, he and the CSE Chairperson (Leslie Mason) "were planning on doing some visits" to some of the residential programs previously recommended by the District.  (Dkt. No. 28, Attach. 4, at 127-28 [attaching pages "127" and "128" of transcript].)  However, the Director testified that those visits did not occur, because of a conversation he had with Plaintiffs during the week of August 24, 2009, in which he and Plaintiffs "mutually agreed that [the visits were not] necessary at the time."  (Dkt. No. 28, Attach. 4, at 127-28, 138-39 [attaching pages "127," "128," "138," and "139" of transcript].)  He testified that the reason the visits were not necessary was that he

"believe[d] that [Plaintiffs] felt very strong about the Family Foundation being the only alternative for A.N.H."  (Dkt. No. 28, Attach. 4, at 127-28 [attaching pages "127" and "128" of transcript].)

At the start of the 2009-2010 school year, Plaintiffs maintained A.N.H.'s placement at the Family Foundation.

When Plaintiffs attended a District CSE meeting on August 5, 2009, they were not residing in the District.[7]  However, again, Plaintiffs are not requesting reimbursement for the brief time that they were admittedly residing outside of the District.  (Dkt. No. 29, Attach. 5, at 45-46 [attaching pages "511" and "512" of transcript].)

C.     **Administrative Decisions**

1.     **Decision of Impartial Hearing Officer**

On September 1, 2009, an impartial hearing convened.  It concluded on September 15, 2009, after four days of testimony.  In a 27-page written decision dated December 13, 2009, the impartial hearing officer ("IHO") determined as follows.

a.     **Decision Regarding the 2008-2009 School Year**

With regard to the 2008-2009 school year, the IHO found that the District deprived A.N.H. of a FAPE for the following four reasons: (1) at the CSE meeting on January 31, 2008,

---

[7]        On May 31, 2009, Plaintiffs had again moved to their second home, in Bainbridge, New York.  A.N.H.'s mother testified that one of the reasons they did so was that they had sold their first home in order to meet "some very large expenses because of A.N.H.'s illness.  (Dkt. No. 29, Attach. 5, at 43-44 [attaching pages "509" and "510" of transcript].)  At the time they moved to their second home in Bainbridge on May 31, 2009, Plaintiffs did so with the intention of moving back to the District at the end of the summer, which they did, on August 20, 2008.   (Dkt. No. 29, Attach. 5, at 43-44 and 46 [attaching pages "509," "510" and "512" of transcript]; Dkt. No. 29, Attach. 6, at 7-8 [attaching pages "569" and "570" of transcript].)  During that summer, Plaintiffs never enrolled A.N.H. in the Bainbridge Schools.

the CSE failed to classify A.N.H. as a student with an emotional disturbance despite possessing

sufficient information at the time of the CSE meeting to support such a classification; (2) despite

possessing evidence indicating the existence of serious mental health issues, the District's

Psychologist failed to pursue further evaluation of A.N.H. and instead "prescribed an altered

academic schedule designed to offer supports;" (3) the CSE failed to develop sufficient

information relative to A.N.H.'s educational history–such as a Functional Behavioral

Assessment (or "FBA")–in advance of the CSE meeting on January 31, 2008; and (4) despite

receiving information from Plaintiffs that A.N.H. was collapsing into depression in March 2008,

the CSE did not reconvene the CSE at that time.  (Dkt. No. 27, Attach. 2, at 15-18].)

In addition, the IHO found that the Family Foundation was an appropriate placement for

A.N.H. for the following four reasons: (1) witness testimony established that A.N.H. had

"stabilized emotionally, [wa]s far less depressed, less anxious, and much more capable of

managing the struggles and difficulties of life"; (2) record evidence established that District staff

who visited Family Foundation indicated that various aspects of Family Foundation's program

were appropriate for A.N.H.; (3) counseling at the Family Foundation focused primarily on

emotional and behavioral issues, specifically, reactive attachment disorder; and (4) literature

from the Family Foundation further supported hearing testimony that the school offered a

program that was appropriate for A.N.H.  (*Id*. at 19-20.)

Finally, the IHO found that the equities supported tuition reimbursement because,

although Plaintiffs failed to afford the District adequate notice of their intention to unilaterally

enroll A.N.H. at Family Foundation and seek tuition reimbursement, Plaintiffs were entitled to

invoke the exception found in 20 U.S.C. § 1412(a)(10)(C)(iv)(II)(bb), applicable where

compliance with the notice requirement would likely result in serious emotional harm to the child.  (*Id*. at 20-23.)

### b.    Decision Regarding the 2009-2010 School Year

With regard to the 2009-2010 school year, the IHO found that the District deprived A.N.H. of a FAPE for the following three reasons: (1) the proposal for a residential placement was never effectuated by the District, given that the District did not take any affirmative steps to place A.N.H. in a particular residential placement (notwithstanding the CSE's promises to do so made at the CSE meetings on June 4, 2009, and August 5, 2009); (2) instead of making a specific referral to a placement that had accepted A.N.H. as a student, the CSE simply provided Plaintiffs with a list of State-approved residential placements, leaving A.N.H. without a recommended placement for the 2009-2010 school year; and (3) the CSE neither provided information to Plaintiffs as to the types of services that the recommended "unnamed school" would offer to A.N.H. (particularly with respect to counseling services) nor did it provide them with any class profiles to enable them to assess whether or not A.N.H. would fit in to a particular class.  (*Id*. at 23-25.)

In addition, the IHO found that the Family Foundation was an appropriate placement for A.N.H. for the 2009-2010 school year, for the same reasons he had found it to be an appropriate placement for the 2008-2009 school year.  (*Id*. at 25.)

Finally, the IHO found that the equities supported tuition reimbursement for the following two reasons: (1) although Plaintiffs failed to afford the District formal notice of their intention to unilaterally enroll A.N.H. at the Family Foundation and seek tuition reimbursement, comments made by Plaintiffs during the CSE meeting on August 5, 2009 (as reflected in

Defendant's Exhibit 38), indicating their strong preference to keep A.N.H. at the Family

Foundation sufficiently communicated their intention to continue the placement at the Family

Foundation if the District was unable to designate an appropriate placement; and (2) "it seem[ed]

to [the IHO] an untenable position that the District did not understand that there was a finite

period of time and that the [student] would stay where she was if an agreed upon placement was

not found." (*Id*. at 25-26.)

### 2.    Decision of State Review Officer

In a 40-page written decision dated February 22, 2010, the State Review Officer ("SRO")

determined as follows.

### a.    Decision Regarding the 2008-2009 School Year

With regard to the 2008-2009 school year (upon until May 1, 2009), the SRO found that

the District did not deprive A.N.H. of a FAPE for the following four reasons: (1) at the time of

the CSE meeting on January 31, 2008, A.N.H. did not meet one or more of the five criteria for

eligibility as a student with an emotional disturbance (nor was the adverse impact on her

educational performance, namely her failing grades, attributable to any such emotional

disturbance); (2) even if A.N.H. had met one of those five criteria, the evidence contained in the

hearing record does not establish that A.N.H. required special education services as a result; (3)

at the time of the CSE meeting on January 31, 2008, the development of an FBA was not

necessary to offer A.N.H. a FAPE (and, even if an FBA was required by State regulation, the

District's failure to develop one did not rise to the level of a denial of a FAPE to A.N.H.); and (4)

no need existed for the CSE to reconvene in March 2008 after being advised that A.N.H. was

"collapsing into depression," because evidence existed suggesting that A.N.H. appeared to be

"fine" in the District's high school, and that she was removed from there merely due to her parents' concerns.  (Dkt. No. 27, Attach. 1, at 23-31.)

However, for the period of May 1, 2009, to June 25, 2009, the SRO found that the District did deprive A.N.H. of a FAPE for the following two reasons: (1) the record evidence does not establish that A.N.H. was accepted to, or would have been appropriately placed at, the specific program recommended by the CSE on April 22, 2009; and (2) generally, a district's recommended placement in a non-district facility prior to a decision by the facility to accept the student is premature in nature and does not satisfy the district's obligation to offer a FAPE.  (*Id.* at 29-31.)

In addition, the SRO found that, in any event, the Family Foundation was not an appropriate placement for A.N.H. for the following four reasons: (1) the hearing record establishes that "the Family Foundation is not a State-approved private school," and is "not a [s]pecial [education] school in the traditional sense"; (2) A.N.H. failed geometry in the spring of 2009, and the admissions director denied knowledge of any supports provided for the student to help her improve her geometry grade; (3) the admissions director testified that most of the counseling provided at Family Foundation was in the form of group counseling, and the hearing record reflects that the school put "greater emphasis" on peer group counseling and use of the "12-step" program rather than individual psychotherapy; and (4) the hearing record does not contain evidence detailing the specifics of A.N.H.'s therapeutic services and how those services addressed A.N.H.'s unique special education needs.  (*Id.* at 31-35.)

Finally, the SRO found that, in any event, the equities did not support tuition reimbursement for the following two reasons: (1) Plaintiffs did not provide the requisite written

notice to the District of their intention to unilaterally place A.N.H. at the Family Foundation at public expense prior to removing her from the District program for the 2008-2009 school year; and (2) there is no record evidence suggesting that Plaintiffs were prevented from furnishing the District with the requisite written notice of their intentions during the six weeks between their email message of March 20, 2008 (notifying, *inter alia*, the District Guidance Counselor that A.N.H. was "collapsing into depression") and their placement of A.N.H. at the Family Foundation on May 2, 2008.  (*Id*. at 35-37.)

### b.       Decision Regarding the 2009-2010 School Year

With regard to the 2009-2010 school year, the SRO found that the District did deprive A.N.H. of a FAPE for the following two reasons: (1) although the District's willingness to research and suggest potentially appropriate therapeutic residential placement alternatives for the parents' consideration and investigation was commendable, the record evidence supports the IHO's conclusion that the District did not have a seat in a recommended appropriate residential placement available for A.N.H. prior to the beginning of the 2009-10; and (2) to meet its legal obligations, a district must have an IEP in effect at the beginning of each school year for each student in its jurisdiction with a disability.  (*Id*. at 37-38.)

In addition, the SRO found that the Family Foundation was not an appropriate placement for A.N.H. for the following two reasons: (1) the record evidence does not differentiate between the educational programs and services used by the Family Foundation to educate A.N.H. during the 2008-2009 school year and those programs and services used by the Family Foundation to educate her during the 2009-2010 school year; and (2) for the same reasons that Family Foundation was not an appropriate placement for A.N.H. during the 2008-2009 school year, it

was not an appropriate placement for A.N.H. during the 2009-2010 school year.  (*Id*. at 38.)

Finally, the SRO found that, in any event, the equities did not support tuition reimbursement for the following reason: contrary to the IHO's finding that Plaintiffs sufficiently communicated their intent at the CSE meeting to place A.N.H. at the Family Foundation for the 2009-2010 school year (in compliance with the notice provision in 20 U.S.C. § 1412[a][10][C][iii][I][aa]), A.N.H.'s mother denied advising the CSE during its meeting on August 5, 2009, that she would reject any residential placements the CSE proposed, that she would continue A.N.H.'s placement at Family Foundation, and that she would seek tuition reimbursement from the district.  (*Id*. at 38-39.)

### D.    Briefing on Parties' Motions for Summary Judgment

Before summarizing the arguments asserted in the parties' memoranda of law on their motions for summary judgment, a few words are necessary regarding the procedural propriety of Plaintiffs' motion for summary judgment.

Defendant filed its motion for summary judgment on May 24, 2011.  (Dkt. No. 12.) Plaintiffs filed their opposition to Defendant's motion on July 5, 2011.  (Dkt. No. 18.) Defendant filed its reply to Plaintiffs' opposition on July 11, 2011.  (Dkt. No. 23.)  Meanwhile, while the above-described briefing was occurring, Plaintiffs filed a separate motion for summary judgment on May 27, 2011.  (Dkt. No. 14.)  Defendant filed its opposition to Plaintiffs' motion on July 5, 2011.  (Dkt. No. 18.)  Plaintiffs filed their reply to Defendant's opposition on July 11, 2011.  (Dkt. No. 23.)

Plaintiffs' decision to file a separate motion for summary judgment, instead of combining that motion with their opposition to Defendant's motion, was in violation of Local Rule 7.1(c) of

the Local Rules of Practice, which they had certified they had read and understood upon their admission to this Court. This rule is no useless technicality. It serves the purpose of, among other things, (1) reasonably limiting the numbers of pages of memoranda of law submitted by the parties, (2) progressively narrowing the scope of the issues presented by the motions (and giving the original movant the last word on the issues presented by the motions), and (3) more importantly, focusing the parties' debate so that they do not repeat themselves on some points, and talk past each other on other points. *See, e.g., Miller v. Elexco Land Servs., Inc.*, 09-CV-0038, 2011 WL 4499281, at *6 (N.D.N.Y. Sept. 27, 2011) (Suddaby, J.) (describing three negative effects of violating Local Rule 7.1[c]).

Here, those purposes were frustrated by Plaintiffs' violation of Local Rule 7.1(c). For example, the parties' memoranda of law total some 111 pages, instead of the 60 pages permitted by Local Rule 7.1(c). In addition, Plaintiffs repeated themselves on some points, and appear to have altogether confused Defendant, which filed–along with its opposition to Plaintiffs' cross-motion–a cross-motion of its own. (Dkt. No. 17.) As expected, Defendant's cross-motion was redundant of its original motion (a fact they acknowledged to the undersigned's Courtroom Deputy by telephone on July 6, 2011). (*Compare* Dkt. No. 17 *with* Dkt. No. 12.)[8]

The request made by counsel for Plaintiffs of the undersigned's Courtroom Deputy by telephone that Plaintiffs be granted–nunc pro tunc–leave to file a separate motion rather than a cross-motion was (while conscientious) belated and improper. In the future, Plaintiffs' counsel is respectfully reminded to seek such leave before filing such a motion, and to do so through a

---

[8]    As a result, Defendant's cross-motion for summary judgment (Dkt. No. 17) is denied as moot.

letter filed on the docket. However, given the fact that Plaintiffs' counsel sought such leave at all, and the fact that their clients are pursuing civil rights claims, the Court will excuse the violation in this particular circumstance and consider all 111 pages of convoluted briefing.

### 1. Parties' Arguments on Defendant's Motion

### a. Defendant's Memorandum of Law in Chief

Generally, in its motion for summary judgment, Defendant asserts the following five arguments: (1) deference to the SRO's Decision of February 22, 2010, is required except with regard to his interpretation of the law; (2) the District complied with the IDEA for the 2008-2009 and 2009-2010 school years, because (a) the SRO correctly found that the District made the correct determination in not classifying A.N.H. as a student with a disability for the 2007-2008 school year and for most of the 2008-2009 school year, and (b) the SRO *incorrectly* found that the District did not provide a FAPE to A.N.H. from May 1, 2009, to June 25, 2009, and for the entire 2009-2010 school year;[9] (3) the SRO correctly found that Plaintiffs failed to establish that the Family Foundation was an appropriate placement to meet A.N.H.'s special education and therapeutic needs, because (a) it did not employ certified special education teachers, (b) it does not have a psychologist or psychiatrist on the premises at all times, (c) it failed to provide education adaptations or accommodations for A.N.H., (d) it failed to provide individual counseling to A.N.H., and (e) A.N.H. continued to receive poor grades at the School and failed one of her courses; (4) the SRO correctly found that the equities do not support tuition

---

[9]         Rather, Defendant argues, the record clearly establishes that, as soon as new information was provided by Plaintiffs, the CSE developed in April of 2009 a proposed IEP for A.N.H. for the remainder of the 2008-2009 school year, which was reasonable because the IDEA does not require that an IEP include a specific educational placement.

reimbursement, because (a) Plaintiffs did not provide the required notice that a FAPE was at issue, and (b) Plaintiffs had no interest in sending their daughter to any placement offered by the District; and (5) Plaintiffs' Section 504 claim should be dismissed because (a) Plaintiffs failed to exhaust their administrative remedies with regard to that claim, and (b) in any event, Plaintiffs have failed to adduce admissible record evidence establishing that the District acted with bad faith or gross misjudgment sufficient to render it liable on such a claim.  (Dkt. No. 12, Attach. 2.)

**b.     Plaintiffs' Opposition Memorandum of Law**

Generally, in opposition to Defendant's motion, Plaintiffs assert the following five arguments: (1) pursuant to the appropriate legal standard, the Court must afford the SRO deference only on matters of educational policy, must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence; (2) the District failed to offer a FAPE to A.N.H. for the 2008-2009 and 2009-2010 school years, because (a) the SRO incorrectly found that the District met its burden of proving that A.N.H. should not be classified as a student with a disability in January 2008, and (b) the SRO (and the IHO) *correctly* found that the April 2009 IEP and August 2009 IEP did not offer a FAPE to A.N.H.; (3) the SRO incorrectly found that Plaintiffs failed to establish that the Family Foundation was an appropriate placement for A.N.H., because (a) a private school need not employ certified special education teachers to be considered appropriate (and in any event A.N.H. was provided special education in the form of counseling by a certified school counselor at the School), (b) a private school need not have a psychologist or psychiatrist on the premises at all times to be considered appropriate, (c) the School did in fact provide education adaptations or accommodations for A.N.H. (e.g., through small class sizes, teacher tutoring and remediation,

47

teacher availability outside of the school day, and peer tutoring), (d) A.N.H. received group counseling at the School, and no evidence exists that A.N.H. needed individual counseling at the School, and (e) while A.N.H. failed one class, she passed all of her other classes, and it is uncontroverted that A.N.H. received educational benefits at the School; (4) the SRO incorrectly found that the equities do not support tuition reimbursement, because (a) the reason Plaintiffs did not provide prior notice to the District that they intended to seek tuition reimbursement when they placed A.N.H. at the Family Foundation in the May of 2008 was that they were concerned that she was in grave danger because of her increasing depression (thus qualifying for the emergency exception to the notice requirement), (b) Plaintiffs did in fact give sufficient notice to the District they intended to seek tuition reimbursement with regard to the 2009-2010 school year, when they participated in a CSE meeting in August of 2009, (c) in any event, the purpose of the notice requirement (to give the District an opportunity prior to removal to investigate whether it can provide a FAPE to the student in its public schools) would not have been achieved here because the District had ample opportunities to take appropriate action but consistently failed to do so, and (d) moreover, the law does not require that tuition reimbursement be denied if prior notice is not provide but rather only that reimbursement *may* be denied *or reduced* if such notice is not provided; and (5) Plaintiffs' Section 504 claim should not be dismissed, because the facts of this case show that the District deliberately ignored A.N.H.'s special education needs from the beginning of the 2007-2008 school year until it finally classified her as a student with a disability in April 2009 (upon Plaintiffs' filing of a Due Process Complaint against the District), and even then the District recommended what it later admitted was an inappropriate placement for A.N.H., then failed to make any specific recommendation for

A.N.H. at all.  (Dkt. No. 18, Attach. 1.)

###        c.        Defendant's Reply Memorandum of Law

Generally, in reply to Plaintiffs' opposition, Defendant asserts the following four

arguments: (1) the Court should defer to the SRO's decision that the Family Foundation was not

an appropriate placement for A.N.H. because (a) Plaintiffs do not cite a single example of the

SRO actually ignoring pertinent facts or relying on erroneous facts, (b) Plaintiffs do not adduce

evidence as to what, if any, tutorial and specific special education services (as those services are

defined by law) were *actually* provided to A.N.H., (c) Plaintiffs are incorrect that the record does

not contain evidence discussing the frequency of counseling services that should be provided to

A.N.H., (d) "counseling" by an unqualified person and/or by A.N.H.'s peers for a student that

was supposedly in a "grave way" is simply not appropriate, and (e) even if A.N.H. made

progress at the Family Foundation, such progress does not determine whether the unilateral

placement was appropriate, because what Plaintiffs must prove is that, *at the time they selected*

*the placement*,  the placement was reasonably calculated to provide A.N.H. with an educational

benefit; (2) the Court should defer to the SRO's decision that the equities do not support an

award of tuition reimbursement, because (a) the record is clear that the District did not receive

notice that Plaintiffs were seeking tuition reimbursement for more than 10 months after they

placed A.N.H. in the Family Foundation, (b) the SRO properly rejected Plaintiffs' argument that

they were somehow prevented from providing written notice of their intentions during the six

weeks between March 20, 2008 (when Plaintiffs notified the District that they were trying to get

A.N.H. a place in a hospital or other therapeutic environment), and May 2, 2008 (when Plaintiffs

placed A.N.H. in the Family Foundation), (c) Plaintiffs meeting with the District over the

summer of 2008 did not provide such notice (and to the contrary notified Plaintiffs that A.N.H. was not classifiable), and (d) Plaintiffs could have, and legally should have, provided such notice at or immediately following their meeting with the District in August of 2009; (3) the District offered to provide a FAPE for both school years, because (a) the District did not violate its "child find" obligations by not classifying A.N.H. as a student with a disability prior to April of 2009, and (b) the District did not violate the IDEA by not including a specific location for A.N.H.'s placement on her 2009-2010 IEP (but rather went beyond its legal obligation by allowing Plaintiffs to pick any school that was on the Education Commissioner's list of approved schools for students with an emotional disturbance); and (4) the Court should dismiss Plaintiffs' Rehabilitation Act claim, because (a) the fact that the SRO found that the District did not violate a FAPE by not classifying A.N.H. prior to April of 2009 is proof that the District did not "deliberately ignore," act in bad faith or grossly misjudge A.N.H.'s education needs, and (b) the fact that the District did not include a specific location for A.N.H.'s placement in the 2009-2010 proposed IEP shows their good faith, not bad faith. (Dkt. No. 23.)

## 2.    Parties' Arguments on Plaintiffs' Cross-Motion

### a.    Plaintiffs' Memorandum of Law in Chief

Generally, in their cross-motion for summary judgment, Plaintiffs assert the following five arguments: (1) the Court must engage in an independent review and based on the preponderance of the evidence should grant judgment for the plaintiffs; (2) the Oneonta City School District failed to offer a FAPE to A.N.H., because (a) the District's CSE erred by not classifying A.N.H. in January of 2008, (b) the IEP developed at the April 2009 CSE was inadequate and did not provide a FAPE, and (c) the IEP developed at the August 2009 CSE was

inadequate and did not provide a FAPE; (3) the Family Foundation was an appropriate

placement for A.N.H. for both the 2008-2009 school year and the 2009-2010 school year; (4)

Plaintiffs' claim for tuition reimbursement is supported by equitable considerations, because (a)

for the 2008-2009 school year, an emergency situation excused the failure to provide technically

sufficient notice, and (b) for the 2009-2010 school year, Plaintiffs filed a Due Process Complaint

requesting reimbursement in February 2009, and asked the District to pay for A.N.H.'s

placement at the Family Foundation during the August 2009 CSE meeting; and (5) the District's

actions violated Section 504 of the Rehabilitation Act, because the District's failure to abide by

the "child find" provision of the IDEA from January 2008 to April 2009 and its failure to ever

recommend an appropriate IEP once it classified A.N.H. as a student with a disability establishes

that it acted with bad faith and/or gross misjudgment.  (Dkt. No. 14)

### b.    Defendant's Opposition Memorandum of Law

Generally, in opposition to Plaintiffs' cross-motion, Defendant asserts the following five

arguments: (1) deference to the SRO's Decision of February 22, 2010, is required except with

regard to his interpretation of the law; (2) the SRO correctly found that Plaintiffs failed to

establish that the Family Foundation was an appropriate placement to meet A.N.H.'s special

education and therapeutic needs, because (a) it did not provide a minute of specifically designed

special education to A.N.H. (or even employ certified special education teachers), (b) it failed to

provide education adaptations or accommodations for A.N.H., (c) it failed to provide more than

infrequent individual counseling to A.N.H. (even though she had suffered numerous psychiatric

hospitalizations and purportedly engaged in suicide attempts), (d) the group counseling it

provided was not led by licensed therapists or counselors, and (e) A.N.H. continued to struggle

academically at the School and failed one of her courses; (3) the District offered a FAPE for both school years, because (a) the SRO correctly found that the District made the correct determination in not classifying A.N.H. as a student with a disability for the 2007-2008 school year and for most of the 2008-2009 school year, and (b) the CSE's alleged failure to reconvene after the January 2008 CSE meeting does not constitute a denial of a FAPE, and (c) the IDEA does not require that an IEP name a specific educational placement that has accepted a student for admission;[10] (4) the SRO correctly found that the equities do not support tuition reimbursement, because (a) Plaintiffs did not provide the required notice that a FAPE was at issue, and (b) Plaintiffs had no interest in sending their daughter to any placement offered by the District; and (5) Plaintiffs' Section 504 claim should be dismissed because they have failed to adduce admissible record evidence establishing that the District acted with bad faith or gross misjudgment sufficient to render it liable on such a claim.  (Dkt. No. 17.)

### c.    Plaintiffs' Reply Memorandum of Law

Generally, in reply to Defendant's opposition, Plaintiffs assert the following four arguments: (1) the SRO's denial of reimbursement should not be upheld, because, pursuant to the appropriate legal standard, the Court must afford the SRO deference only on matters of educational policy, must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence; (2) the SRO and Defendant misstated the facts and misinterpreted the law in concluding that the Family Foundation was not

---

[10]    Rather, Defendant argues, the record clearly establishes that, as soon as new information was provided by Plaintiffs, the CSE developed in April of 2009 a proposed IEP for A.N.H. for the remainder of the 2008-2009 school year, which was reasonable because the IDEA does not require that an IEP include a specific educational placement.

appropriate, because (a) a private school need not employ certified special education teachers to be considered appropriate (and in any event A.N.H. was provided weekly special education in the form of counseling by a certified school counselor who is a social worker with a masters degree in education), (b) even if the Family Foundation's "table talk" and 12-step programs did not constitute appropriate counseling, the weekly group counseling that A.N.H. received with a certified school counselor did constitute appropriate counseling, (c) the only IEP to specifically recommend counseling at all was the Hancock IESP, which recommended group counseling, and (d) A.N.H.'s grades improved dramatically after she entered the Family Foundation (causing her to earn seven credits during her first year there, twice as many as she earned in total during *two* years at the District High School), and she progressed with regard to her emotional and inter-personal growth; (3) the District did not offer A.N.H. a FAPE for the 2008-2009 or 2009-2010 school years, because (a) A.N.H. met the criteria for classification as Emotionally Disturbed at the time of the January 2008 CSE, (b) the SRO (and the IHO) correctly found that the April 2009 IEP and August 2009 IEP did not offer a FAPE to A.N.H., in part because, by not naming a specific private school that had accepted A.N.H., the IEP was incomplete, preventing the District from implementing it; (4) equity supports reimbursement to Plaintiffs, because (a) the only direct evidence of Plaintiffs' purported lack of intention of withdrawing A.N.H. from the Family Foundation was Plaintiffs' testimony that, while their first preference was the Family Foundation, they were willing to consider another program in light of their inability to continue paying for that school, and (b) although it was not Plaintiffs' duty to investigate every residential school mentioned by the District, Plaintiffs did in fact call and visit several of the placements that the District suggested, but were prevented from obtaining meaningful information from

some of them because the District had not made a referral for that placement.  (Dkt. No. 25)

## II.    GOVERNING LEGAL STANDARDS

### A.    Motions for Summary Judgment in IDEA Actions

Summary judgment serves as a "pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in the IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." *See Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 83, n.3 (2d Cir. 2005) (internal quotation marks omitted).

As a result, actions brought in federal court pursuant to the IDEA "generally are resolved by examination of the administrative record in a summary judgment procedural posture." *J.R. v. Bd. of Educ.*, 345 F. Supp.2d 386, 394 (S.D.N.Y. 2004). However, motions for summary judgment filed in IDEA actions employ a different legal standard than do traditional summary judgment motions, because in the former such motions "the existence of a disputed issue of material fact will not defeat the motion."   *J.R.*, 345 F. Supp.2d at 394; *accord, T.M. ex rel. T.D.M. v. Kingston City Sch. Dist.*, 11-CV-0605, 2012 WL 4076146, at *3 (N.D.N.Y. Sept. 18, 2012) (Hurd, J.); *J.K. v. Springville-Griffith Institute Cent. Sch. Dist. Bd. of Educ.*, 02-CV-0765, 2005 WL 711866, at *6 (W.D.N.Y. March 28, 2005).  Instead, district courts reviewing administrative decisions under the IDEA must determine whether the decision is supported by "the preponderance of the evidence," taking into account the administrative record and any further evidence presented by the parties.  20 U.S.C. § 1415(i)(2)(C); *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003).[11]  However, the Supreme Court has cautioned that

---

[11]       Indeed, the IDEA summary judgment procedure has been characterized as an appeal from an administrative determination. *Lillbask*, 397 F.3d at 83, n.3; *accord, T.K. v. New York City Dep't of Educ.*, 779 F. Supp. 289, 306 (E.D.N.Y. 2011).

this preponderance-of-the-evidence standard "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982); *accord, Bougades v. Pine Plains Cent. Sch. Dist.*, 376 F. App'x 95, 98 (2d Cir. 2010); *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009).

Accordingly, an SRO's decision that "is reasoned and supported by the record" should not be disturbed. *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 114 (2d Cir. 2007).[12] Rather, a district court must give "due weight" and grant "substantial deference" to the findings of a SRO on issues of educational policy, especially where the court's analysis is based solely on the same evidence in the administrative record as is the analysis of the SRO. *See Bougades*, 376 F. App'x at 97-98; *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir.2005); *Grim*, 346 F.3d at 381; *M.S. ex rel. S.S. v. Bd. of Educ.*, 231 F.3d 96, 105 (2d Cir. 2000), *abrogated on other grounds by Schaffer v. Weast*, 546 U.S. 49 (2005).[13]

However, factual findings that are unsupported or controverted by the record may be rejected. *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp.2d 514, 521 (S.D.N.Y. 2011)

---

[12]     To the extent that the SRO's determination conflicts with an earlier decision by an Impartial Hearing Officer ("IHO"), as it does here, "the earlier decision [by the IHO] may be afforded diminished weight." *Gagliardo*, 489 F.3d at 114, n.2; *see. e.g., Watson v. Kingston City Sch. Dist.*, 325 F. Supp.2d 141, 145 (N.D.N.Y. 2004) (Hurd, J.), *aff'd*, 142 F. App'x 9 (2d Cir. 2005). However, courts may defer to the IHO's decision if the conclusions therein are based on demeanor or credibility evidence. *M.H. v. New York City Dept. of Educ.*, 685 F.3d 217, 246 (2d Cir. 2012), *aff'g*, 712 F. Supp.2d 125, 155 (S.D.N.Y. 2010); *J.R. v. Bd. of Educ.*, 345 F.Supp.2d 386, 399 (S.D.N.Y.2004).

[13]     The rationale for this due weight and substantial deference is that the judiciary generally "lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir.1998) (quoting *Rowley*, 458 U.S. at 206).

(internal quotation marks omitted).  Finally, the "due weight" that must ordinarily be given to the findings of an administrative body is not implicated where the body's decision concerns an issue of law instead of an issue of educational policy. *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir.1997).

### B.      Claims for Tuition Reimbursement Under the IDEA

Under the IDEA, states receiving federal funds are required to provide "all children with disabilities" a FAPE.  20 U.S.C. § 1412(a)(1)(A); *Rowley*, 458 U.S. at 207.  To meet these requirements, a school district must provide, *inter alia*, "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Rowley*, 458 U.S. at 207); *see also* 20 U.S.C. § 1401(9)(A)-(D). These services must be provided pursuant to an Individualized Education Program (or "IEP"), which the school district must review annually.  20 U.S.C. § 1401(9)(D); 20 U.S.C. § 1414(d).

To meet these requirements, New York has assigned responsibility for developing IEPs to local Committees on Special Education ("CSE").  *Walczak*, 142 F.3d at 123 (citing N.Y. Educ. Law § 4402[1][b][1]).  New York parents who disagree with their child's IEP may challenge it in an "impartial due process hearing."  20 U.S.C. § 1415(f).  The hearing is held before an impartial hearing officer (or "IHO") appointed by the local board of education.  N.Y. Educ. Law § 4404(1).  The decision of the IHO may be appealed to a State Review Officer (or "SRO").  N.Y. Educ. Law § 4402(2).  Following exhustion of remedies available under state law, any party still aggrieved may challenge the decision of the SRO in either state or federal court.  20 U.S.C. § 1415(i)(2)(A).

Within this procedural framework, if a parent believes that a district has not developed an appropriate IEP which provides a FAPE, the parent may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the district. *Burlington Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 370 (1985); *M.S. v. Yonkers Bd. of Educ.,* 231 F.3d 96, 102 (2d Cir. 2000).

To establish entitlement to tuition reimbursement under the IDEA once they file suit in federal court, the parents of a disabled child (if they are the parties who commenced the impartial hearing in the case) must establish three factors, (called "the *Burlington/Carter* factors"): (1) that the District's IEP was inappropriate to meet their child's special needs; (2) that the parents' placement was appropriate; and (3) that equitable considerations favor awarding the parents tuition reimbursement. *Burlington*, 471 U.S. at 369-70; *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993); *Schaffer,* 546 U.S. at 56-58; *R.E. v. New York City Dep't of Educ.,* 694 F.3d 167, 184-85 (2d Cir. 2012); *T.Y v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir.2009); *Gagliardo*, 489 F.3d at 112; *Carmen Cent. Sch. Dist. v. V.P.*, 373 F. Supp.2d 402, 417 (S.D.N.Y. 2005), *aff'd*, 192 F. App'x 62 (2d Cir. 2006); *R.E. v. New York City Dep't of Educ.,* 694 F.3d 167, 185 (2d Cir. 2012).

Under the first *Burlington/Carter* factor, "[t]wo issues are relevant to a federal court's review of a challenged IEP: (1) whether the state complied with the procedural requirements of the IDEA, and (2) whether the challenged IEP was substantively appropriate, or 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206-07).

Under the second *Burlington/Carter* factor, the services provided by the private school

must have been "proper under the Act," meaning the school offered an educational program that met the child's special education needs. *Carter*, 510 U.S. at 12, 15. The test for parental placement is whether the placement is appropriate, not perfect. *C.L. v. Scarsdale Union Free School Dist.,* 11-CV-5242, 2012 WL 6646958, at *5 (S.D.N.Y. Dec. 21, 2012) (citing *Warren G. V. Cumberland Co. Sch. Dist.*, 190 F.3d 80, 84 [3d Cir. 1999]). Parents do not need to demonstrate that the placement maximizes potential of their child, but only that the placement is "reasonably calculated to enable the child to receive educational benefits." *Frank G.*, 459 F.3d at 364. As a result, a parent's selection of a school that is not approved by the state is not, in and of itself, a bar to reimbursement. *Carter*, 510 U.S. at 7, 14. Moreover, the private school is not required to employ certified special education teachers or have an individualized IEP for the student. *Carter*, 510 U.S. at 7. Rather, a private placement is "appropriate if it provides 'education instruction *specifically* designed to meet the *unique* needs of a handicapped child." *Id*. at 365 (emphasis in original). A student's grades, test scores and advancement from one grade to the next, although not dispositive of the issue of appropriateness, may be considered in deciding that issue. *Id*. at 366.

Under the third *Burlington/Carter* factor, "equitable considerations relating to the reasonableness of the action taken by the parents are relevant." *M.H. v. New York City Dept. of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012) (quoting *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 [2d Cir. 2009]). For example, tuition reimbursement may be reduced or denied if the parents failed to timely notify the school district of their intent to place the child in a private school at the school district's expense. *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 376 (2d Cir. 2006). *See also, supra,* note 15 of this Decision and Order.

### C.    Claims Under Section 504 of the Rehabilitative Act

In addition to their obligation to provide an appropriate education under the IDEA, state and local educational agencies are required to provide a free appropriate education for children with disabilities pursuant to Section 504 of the Rehabilitation Act. *Wenger v. Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997) (Scullin, J.), *aff'd*, 308 F.3d 204 (2d Cir. 2000). Section 504 states, in pertinent part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. In this way, Section 504 provides relief from discrimination, whereas the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination. *Wenger*, 979 F. Supp. at 152.

As a result, the fact that an incorrect evaluation has been made, and that a different placement is required, under the IDEA does not necessarily mean that a disabled child has been discriminated against solely by reason of his or her disability. *Id*. Rather, something more than a mere violation of the IDEA is required in order to show a violation of Section 504 in the context of educating children with disabilities. *Id*. Specifically, a plaintiff must demonstrate that a school district acted with bad faith or gross misjudgment. *Id.; accord, Weixel v. Bd. of Educ. of the City of New York*, 97-CV-9367, 2000 WL 1100395, at *3 (S.D.N.Y. Aug. 7, 2000), *aff'd in part, rev'd in part*, 287 F.3d 138 (2d Cir. 2002); *R.B. v. Bd. of Educ. of City of New York*, 99 F. Supp.2d 411, 419 (S.D.N.Y. 2000).

## II.   ANALYSIS

### A.   Whether Plaintiffs Are Entitled to Tuition Reimbursement Under the IDEA and NY Education Law for the 2008-2009 School Year

#### 1.   Whether the District Denied A.N.H. a FAPE for the 2008-2009 School Year

After carefully considering the matter, the Court answers this question in the affirmative for the discrete period of May 1, 2009, to May 31, 2009.  However, the Court answers this question in the negative for the remaining periods within the 2008-2009 school year (i.e., the period before May 4, 2009, and after May 31, 2009).

More specifically, for the 2008-2009 school year preceding May 1, 2009, the CSE had not yet classified A.N.H., and the Court can find no substantial error in that decision, for the reasons stated by Defendant and the SRO.  *See, supra,* Part I.D.1.a., I.D.1.c., I.D.2.b., and I.C.2. of this Decision and Order.  The Court would add only that, while this question is a close one, the Court finds that the record sufficiently supports the SRO's findings regarding this period.  As a result, the Court finds that the District was providing a FAPE to A.N.H. during that time period.

For the period between May 1, 2009, and May 31, 2009, while the CSE had recommended a specific placement for A.N.H., it was not a placement at a program to which A.N.H. had been accepted.  In any event, on May 4, 2009, Plaintiffs rejected that placement (after investigating it), and the District did not subsequently recommend another specific placement.  As a result, the Court finds that the District was not providing a FAPE to A.N.H. during that time period, for the reasons stated by Plaintiffs, the IHO, and the SRO.  *See, supra,* Part I.D.1.a., I.D.1.c., I.D.2.b., I.C.1., and I.C.2. of this Decision and Order.

For the period between June 1, 2009, and June 25, 2009, the CSE continued to fail to recommend a specific placement at a program to which A.N.H. had been accepted. However, at the administrative hearing in this action, Plaintiffs declared they were not seeking reimbursement for the period of June 1, 2009, to June 25, 2009. (*See* Dkt. No. 29, Attach. 5, at 46 [attaching page "512" of transcript, stating that Plaintiffs were not seeking reimbursement from the District for June of 2009 because "we had to leave where we were staying at 81 Ford Avenue. We did not have–although we purchased our house the next month, we did not yet have it, so we had to briefly commute from Bainbridge"].)[14]  Neither the SRO nor the IHO appear to have acknowledged that fact. As a result, the Court finds that this time period is not at issue in this action.

> **2.      Whether the Family Foundation Was an Appropriate Placement to Meet A.N.H.'s Special Needs for the 2008-2009 School Year**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Plaintiffs and the IHO. *See, supra,* Parts I.D.1.b., I.D.2.a., I.D.2.c., and I.C.1. of this Decision and Order. To those reasons the Court adds the following analysis.

As explained above in Part I.C.2. of this Decision and Order, generally the SRO found

---

[14]      Defendant argues that Plaintiffs could not, if they chose, seek reimbursement for period of June 1, 2009, to June 25, 2009, due to their having moved to their second home for the summer during that time. The Court notes that Defendant has not cited legal authorities warranting the legal conclusion that Plaintiffs did not in fact retain residency in the District from June 1, 2009, to June 25, 2009, for purposes of the New York State Education Law and IDEA (despite Plaintiffs' lay understanding of the legal impact of their moving to a second home for the summer). Nor has Defendant cited legal authorities warranting the conclusion that, where a temporary (e.g., seasonal) non-resident has stated an intent to unilaterally place a student at a private school and requests reimbursement for that placement, the notice does not become sufficient (for purposes of the New York State Education Law and IDEA) upon the expiration of that non-residence. In any event, as stated above, Plaintiffs have declared they are not seeking reimbursement for this particular period.

that the Family Foundation was not an appropriate placement for A.N.H. for the 2008-2009 school year for the following four reasons: (1) the hearing record establishes that "the Family Foundation is not a State-approved private school," and is "not a [s]pecial [education] school in the traditional sense"; (2) A.N.H. failed geometry in the spring of 2009, and the admissions director denied knowledge of any supports provided for the student to help her improve her geometry grade; (3) the admissions director testified that most of the counseling provided at Family Foundation was in the form of group counseling, and the hearing record reflects that the school put "greater emphasis" on peer group counseling and use of the "12-step" program rather than individual psychotherapy; and (4) the hearing record does not contain evidence detailing the specifics of A.N.H.'s therapeutic services and how those services addressed A.N.H.'s unique special education needs.  (Dkt. No. 27, Attach. 1, at 31-35.)

With regard to the first reason offered by the SRO, in support of his finding that the "Family Foundation is not a State-approved private school," the SRO cites pages 380, 389 and 399 of the transcript.  (Dkt. No. 27, Attach. 1, at 32.)  However, the pages cited by the SRO do not in fact support such a finding, but merely a finding that (by choice) the Family Foundation is not on New York State Education *Commissioner's* list of state-approved residential *special education* schools.  (Dkt. No. 29, Attach. 4, at 26, 35 and 45 [attaching pages "380," "389" and "399" of transcript]; *see also* Dkt. No. 29, Attach. 1, at 80-88 [Def.'s Exs. 40-41].)  Indeed, it is uncontroverted in the record that the Family Foundation is registered as a therapeutic boarding school with the New York State Board of Regents; it provides a New York State Regents Curriculum; it is in good standing with the New York State Department of Regents; it is accredited by the Middle States Association of Colleges and Secondary Schools; and it is

accredited by the Joint Commission.  *See, supra,* Part I.B.2.h. of this Decision and Order.  None of those facts appear to have been expressly or sufficiently considered by the SRO.  In any event, as acknowledged by the SRO, a parent's selection of a school that is not approved by the state is not, in and of itself, a bar to reimbursement.  *Carter*, 510 U.S. at 7, 14.

Moreover, while it is true that the Family Foundation is "not a [s]pecial [education] school in the traditional sense," it is also true that, as acknowledged by the SRO, a private school is not required to employ certified special education teachers to be "proper under the Act." *Carter*, 510 U.S. at 7.  In any event, it is also uncontroverted that the Family Foundation provided to A.N.H. the following type of counseling, among others: (1) "family" group counseling on a weekly basis led by a clinical social worker who possessed a Master's degree in Education and a certification in school counseling; (2) "grief and loss survivor" group counseling (due to the loss of a pregnancy) on a weekly basis led by the Family Foundation's Vice President who possessed a Master's degree in Clinical Psychology and a Bachelor's degree in Psychology; (3) other group counseling (including group counseling for adoptees) supervised (although not led) by the Director of Counseling, who was a licensed clinical social worker; and (4) individual psychotherapeutic counseling conducted by the Director of Counseling, who again was a licensed clinical social worker.  *See, supra,* Part I.B.3.d. of this Decision and Order.  As argued by Plaintiffs, under the New York Education Law, "special education" means "specially designed instruction which includes special services"; and "special services" means, inter alia, "related services," which includes "counseling services."  N.Y. Educ. Law § 4401(1), (2)(k); 8 N.Y.C.R.R. § 200.1(qq),(ww); *see, e.g., Holmes by Holmes v. Sobol*, 690 F. Supp. 154, 159-60 (W.D.N.Y. 1988) ("'Special services or programs' is defined to mean, inter alia, '[r]elated

services which . . . include audiology, *counseling*, occupational therapy, physical therapy . . . and

other appropriate support services.'") (emphasis added).  Indeed, the Hancock IESP and the

District's two IEPs recommended counseling for A.N.H.  *See, supra,* Parts I.B.3.b., I.B.3.e., and

I.B.4. of this Decision and Order.  For example, the Hancock CSE specifically recommended

that A.N.H. receive *group* counseling for adoptees.  (Dkt. No. 29, Attach. 1, at 20, 22.)  *See also*

*Bd. of Educ. of City Sch. Dist. of City of Buffalo v. Munoz,* 792 N.Y.S.2d 275, 276 (N.Y. App.

Div., 4th Dep't 2005) (indicating that group counseling recommended by an IEP was a special

education service).  However, the fact that *special education* in the form of counseling was

indeed provided to A.N.H. does not appear to have been expressly or sufficiently considered by

the SRO.

Also apparently not expressly or sufficiently considered by the SRO (despite his demand

for "specifics" regarding how the numerous types of counseling offered by the Family

Foundation met A.N.H.'s emotional disturbance, depression and oppositional defiant disorder)

were the following undisputed facts: (1) that the Family Foundation's Vice President for

External Relations and Director of Admissions (Jeffrey Brain), who ran one of A.N.H.'s

counseling groups, testified that A.N.H. progressed "very well" within her counseling groups,

becoming significantly more emotionally stabilized since her start at the Family

Foundation–showing far less depression, less anxiety, a greater capability of managing the

struggles and difficulty of life (thus improving her disability of emotional disturbance,

depression and oppositional defiant disorder); (2) that, for example, the Family Foundation's

Vice President for External Relations and Director of Admissions testified that, in her "grief and

loss survivor group," A.N.H. had, "through some exercises," "very recently come to a point of

almost closure" regarding that event; and (3) the District's Director of Special Education (Gary Koutnik) noted (following a visit to the Family Foundation) that A.N.H.'s counselor (Marcia Ertola) informed him that, through counseling, A.N.H. has, *inter alia*, "give[n] up struggling with the program," "move[d] [past]" her "[b]ody image" issues (stemming from comparing herself to others), improved in dealing with her "[a]nger issues," and become less withdrawn emotionally and more "connect[ed] . . . with [her] peers." *See, supra,* Part I.B.3.d. of this Decision and Order. The SRO's persistent demand for "specifics" regarding how the numerous types of counseling offered by the Family Foundation treated A.N.H.'s emotional disturbance, depression and oppositional defiant disorder is a discounting, if not total disregard, of the three above-described facts.

It should be noted that the District's two IEPs do not provide the "specifics" of how the types of counseling shall treat A.N.H.'s emotional disturbance, depression and oppositional defiant disorder, other than to indicate that it should be aimed at (1) developing her ability to recognize and communicate distressing feelings and seek help appropriately, (2) allowing her to respond to emotional distress with strategies that lead to both short-term relief and long-term growth and maturity, and (3) developing and maintaining peer relationships that result in positive social relations. (Dkt. No. 29, Attach. 1, at 58, 60 [attaching pages "5" and "7" of Def.'s Ex. 37]; Dkt. No. 29, Attach. 1, at 73 [attaching page "5" of Def.'s Ex. 39].) According to the notes of District's Director of Special Education (Gary Koutnik), A.N.H.'s counselor (Marcia Ertola) advised him that the various types of counseling provided by the Family Foundation are focusing on, inter alia, (1) steering A.N.H. away from being overly dependent on therapists for the answers, and instead relying on herself and her "family," (2) helping A.N.H. to "look for 'the

next right step' instead of [engaging in] drama and emotional uproar," and (3) "connecting well

with peers," and "learning to deal with jealously, especially of girls who are doing better than

she is." (Dkt. No. 29, Attach. 1, at 31, 32 [Def.'s Ex. 32].) The SRO does not appear to have

expressly or sufficiently considered those facts.

Moreover, it is uncontroverted that the Family Foundation offers smaller class sizes of on

average 12 students each (with an overall student-teacher ratio of 8-1). *See, supra,* Part I.B.2.h.

of this Decision and Order. The District Psychologist (Diana Rutherford) recognized the utility

of a small class size on students who have emotional and behavioral concerns. (Dkt. No. 29,

Attach. 2, at 76 [attaching page "219" of transcript].) The fact that the smaller class sizes were

offered to all students of the Family Foundation (approximately half of whom have difficulties

learning) and not just A.N.H. does not change the fact that it was, in pertinent part, tailored to

A.N.H.'s needs.

Similarly, it is uncontroverted that A.N.H. had "[b]ody image" issues (stemming from

comparing herself to others). *See, supra,* Part I.B.3.d. of this Decision and Order. Indeed, two

IEPs developed by the District both reflect that "[b]ody image issues are significant for

[A.N.H.]." *See, supra,* note 6 of this Decision and Order. The District's Director of Special

Education (Gary Koutnik) noted (following a visit to the Family Foundation) that A.N.H.'s

counselor (Marcia Ertola) informed him that the Family Foundation requires students to "dress-

down" (e.g., requiring girls to put their hair up, wear no makeup, and wear loose sweats), which

has helped A.N.H. with her "[b]ody image" issues. (Dkt. No. 29, Attach. 1, at 31 [Def.'s Ex.

32].) These facts also appear to have been disregarded by the SRO.

With regard to the second reason offered by the SRO, while it is true that A.N.H. failed

geometry in the spring of 2009, it is undisputed that A.N.H. passed eight of her ten academic courses during the 2008-2009 school year (all Regents-level courses). *See, supra,* Part I.B.3.d. of this Decision and Order.   This was far in excess of the two academic courses she passed at the District's alternative school during the 2007-2008 school year (only one of which was a Regents-level course), and the one academic course she passed at the District's high school during the 2006-2007 school year (which was not a Regents-level course). *See, supra,* Parts I.B.1. and I.B.2.g. of this Decision and Order.  In any event, it is well settled that all courses need not be passed for a placement to be appropriate. *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006) (explaining that grades are merely "factors [that] can . . . be helpful in determining the appropriateness of an alternative educational placement").   Furthermore, it is undisputed that one of the reasons Plaintiffs rejected one of the placements recommended by the District was that the academics at that placement was not as "rigorous" as those at the Family Foundation. *See, supra,* Part I.B.3.f. of this Decision and Order.  The SRO does not appear to have expressly or sufficiently considered these facts.

     Moreover, while it is true that the admissions director denied knowledge of any supports provided for A.N.H. to help her improve her geometry grade, it is undisputed that, during the 2008-2009 school year, the Family Foundation *offered* A.N.H. an instructional classroom structure that allows for teacher tutoring within the classroom, as well as "a lot of" peer tutoring (the latter being conducted by an older student who has a mastery of the subject area). *See, supra,* Part I.B.3.d. of this Decision and Order.  Based on the record, the inference that A.N.H. in fact *availed herself of* the teacher-conducted and/or peer-conducted tutoring services offered by the District in the spring of 2008 appears entirely reasonable.  The Court notes that, as of July

2009, A.N.H.'s Geometry grade had risen from a 69 (failing by six points) to an 84 (passing by nine points). (Dkt. No. 28, Attach. 2, at 72, 92.) In any event, the SRO's demand specific evidence corroborating the fact that A.N.H. availed herself of this tutoring appears both unsupported by the law and at odds with the record, which indicates that what was needed was that the placement *offer* tutoring in a way that A.N.H. could avail herself of it. (*See, e.g.,* Dkt. No. 29, Attach. 1, at 59-60 [attaching pages "6" and "7" of District's IEP of Apr. 22, 2009, setting as annual goal that A.N.H. "will seek appropriate assistance from teachers or peers when this assistance is necessary to continue her academic progress"]; *accord*, Dkt. No. 29, Attach. 1, at 75 [attaching page "7" of District's IEP of Aug. 5, 2009].) The SRO does not appear to have expressly or sufficiently considered these facts.

With regard to the third and fourth reasons offered by the SRO, as explained above, the SRO appears to have effectively imposed a requirement that the Family Foundation provide A.N.H. individual psychotherapy by a certified counselor, even though *individual* counseling by *certified* counselors does not appear to be required for counseling to be appropriate under the IDEA. *See* 34 C.F.R. § 300.34(c)(2) ("Counseling services means services provided by *qualified* social workers, psychologists, guidance counselors, or *other qualified personnel*.") (emphasis added); *cf. Carter*, 510 U.S. at 7 (explaining that a private school is not required to employ certified special education teachers to be "proper under the Act"). In so doing, the SRO appears to have effectively disregarded the types of counseling recommended for, and received by, A.N.H., and the qualifications of those counselors. In addition, as described above, the SRO appears to have effectively disregarded the specific improvements made with regard to A.N.H.'s disability as a result of that counseling.

For all of these reasons, the Court respectfully rejects the findings of the SRO on this issue.

### 3. Whether the Equities Favor Tuition Reimbursement for the 2008-2009 School Year

After carefully considering the matter, the Court answers this question in the affirmative. The Court reaches this conclusion for each of three alternative reasons.

First, the Court agrees with Plaintiffs that the law does not require that tuition reimbursement be denied if prior notice is not provided, but rather only that reimbursement may be denied or reduced if such notice is not provided.[15] Here, the Court has considered reducing the reimbursement by a period of ten business days following May 4, 2009 (the date on which Plaintiffs notified the District's Director of Special Education by email message that the

---

[15]     In reaching this conclusion, the Court relies on the statute cited by Plaintiffs for that point of law. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb) ("The cost of reimbursement . . . may be reduced or denied . . . if . . . 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency [that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense].").  In addition, the Court relies on numerous cases for that point of law.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U .S. 230, 247 (2009) ("[C]ourts retain discretion to reduce the amount of a reimbursement award if the equities so warrant–for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school."); *accord, Frank G.*, 459 F.3d at 376; *Weaver v. Millbrook Cent. School Dist.,* 812 F. Supp.2d 514, 522 (S.D.N.Y. Sept. 6, 2011); *New York City Dept. of Educ. v. V.S.*, 10-CV-5120, 2011 WL 3273922, at *15 (E.D.N.Y. July 29, 2011); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp.2d 552, 572 (S.D.N.Y. Sept. 30, 2010); *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp.2d 529, 54 (S.D.N.Y. March 31, 2010); *A.D. v. Bd. of Educ.*, 690 F. Supp.2d 193, 215 (S.D.N.Y. 2010); *cf. Wood v. Kingston City Sch. Dist.*, 08-CV-1371, 2010 WL 3907829, at *6 (N.D.N.Y. Sept. 29, 2010) (Mordue, C.J.) ("One *factor* the Court must consider [in deciding whether the equities favor awarding relief] is whether plaintiffs have complied with the IDEA's requirement that they timely notify the District of their dissatisfaction with the proposed IEP and placement of their child in a private school.") (emphasis added).

recommended placement was inappropriate for A.N.H). However, the Court agrees with

Plaintiffs that the purpose of the notice requirement is to give the district an opportunity prior to

removal to investigate whether it can provide a FAPE to the student in its public schools.[16] Here,

the Court finds that it would have been futile for Plaintiffs to have given the District that

opportunity, considering that, *at best*, the District would have done what it did on April 22,

2009–merely recommended a specific program to which A.N.H. had not yet been accepted.

(Indeed, the District did not even go that far following its receipt of Plaintiffs' email message of

May 4, 2009, instead merely giving Plaintiffs a list of programs.) The SRO does not appear to

have expressly or sufficiently considered these facts. (Dkt. No. 27, Attach. 1, at 35-37, 39.) For

these reasons, the Court exercises its authority to not deny or even reduce the reimbursement.

     Second, in any event, the Court is persuaded by authority supporting the point of law

that, where, as here, a district has abdicated the placement process to a parent (by giving the

parent the names of residential placement facilities to investigate), and there is no indication in

the record that the district was unaware that the parent had been exploring alternative

placements, the district should be deemed to be on notice that the parent would act. *See Lamoine*

---

[16]    In reaching this conclusion, the Court relies on the case cited by Plaintiffs for that point of law. *See Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 160 (1st Cir. 2004) ("This serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a free appropriate public education can be provided in the public schools."). In addition, the Court relies on two cases for that point of law. *See L.K. v. Dept. of Educ. of the City of New*, 09-CV-2266, 2011 WL 127063, at *12 (E.D.N.Y. Jan. 13, 2011) ("This requirement is meant to give the school district an opportunity to cure whatever defects the parent may find in the public placement and provide a FAPE prior to unilateral placement."); *S.W. v. New York City Dept. of Educ.*, 646 F. Supp.2d 346, 361 (S.D.N.Y. 2009) ("[T]he notice requirement serves the important function of facilitating cooperation between parents and school districts by requiring parents to give the school system an opportunity to provide the student with a FAPE in public school before resorting to a private school placement.").

*Sch. Comm. v. Ms. Z. ex rel. N.S.*, 353 F. Supp.2d 18, 44 (D. Me. 2005).

Third, in any event, the Court is persuaded by the reasons offered by Plaintiffs and the IHO for excusing the notice requirement. *See, supra,* Parts I.D.1.b., I.D.2.a., I.D.2.c., and I.C.1. of this Decision and Order. For example, in March and April of 2008, the District was repeatedly advised (albeit informally) of Plaintiffs' intent to unilaterally place A.N.H. at the Family Foundation; the District was also advised of A.N.H.'s collapse into depression between March of 2008, and May 2, 2008. *See, supra,* Part I.B.2.g. of this Decision and Order. Furthermore, in August of 2008, the District was advised (again, albeit informally) of Plaintiffs' intent to seek reimbursement for that placement. *See, supra,* Part I.B.3.a. of this Decision and Order. Finally, in February, March and April of 2009, the District was again notified, through the filing of the Due Process Complaint, the District's participation in a Resolution Session, and the District's holding of a CSE meeting, that A.N.H. had been placed at the Family Foundation for the 2008-2009 school year, and that the Plaintiffs were seeking reimbursement therefor (including the remainder of the 2008-2009 school year) unless an appropriate placement was found by the District. *See, supra,* Parts III.B.3.c and III.B.3.e. of this Decision and Order. Finally, the Court is also persuaded by the fact that, in early May of 2009, it appears that Plaintiffs were in the process of selling their home in order to pay for the tuition that they had been seeking reimbursement. *See, supra,* note 7 of this Decision and Order. Under the circumstances, the Court finds the equities weigh decidedly in Plaintiffs' favor.

For all of these reasons, the Court awards Plaintiffs tuition reimbursement at the Family Foundation for the period of May 1, 2009, to May 31, 2009.

**B.      Whether Plaintiffs Are Entitled to Tuition Reimbursement Under the IDEA and NY Education Law for the 2009-2010 School Year**

**1.      Whether the District Denied A.N.H. a FAPE for the 2009-2010 School Year**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Plaintiffs, the IHO and the SRO. *See, supra,* Parts I.D.1.b., I.D.2.a., I.D.2.c., I.C.1., and I.C.2. of this Decision and Order. The Court would add only one point.

Defendant attempts to make an issue of the fact that, when Plaintiffs attended the District CSE meeting on August 5, 2009, they were not residing in the District.[17] However, again, Plaintiffs are not requesting reimbursement for the time that they were admittedly residing outside of the District (which outside residence ended on August 20, 2009). (Dkt. No. 29, Attach. 5, at 45-46 [attaching pages "511" and "512" of transcript].) As stated above in note 14 of this Decision and Order, Defendant has not cited legal authorities warranting the legal conclusion that Plaintiffs did not in fact retain residency in the District from June 1, 2009, to August 20, 2009, for purposes of the New York State Education Law and IDEA (despite Plaintiffs' lay understanding of the legal impact of their moving to a second home for the summer). Nor has Defendant cited legal authorities warranting the conclusion that, where a temporary (e.g., seasonal) non-resident has stated an intent to unilaterally place a student at a

---

[17]      On May 31, 2009, Plaintiffs had again moved to their second home, in Bainbridge, New York. A.N.H.'s mother testified that one of the reasons they did so was that they had sold their first home in order to meet "some very large expenses because of A.N.H.'s illness. (Dkt. No. 29, Attach. 5, at 43-44 [attaching pages "509" and "510" of transcript].) At the time they moved to their second home in Bainbridge on May 31, 2009, Plaintiffs did so with the intention of moving back to the District at the end of the summer, which they did, on August 20, 2008. (Dkt. No. 29, Attach. 5, at 43-44 and 46 [attaching pages "509," "510" and "512" of transcript]; Dkt. No. 29, Attach. 6, at 7-8 [attaching pages "569" and "570" of transcript].) During that summer, Plaintiffs never enrolled A.N.H. in the Bainbridge Schools.

private school and request reimbursement for that placement, the notice does not become sufficient (for purposes of the New York State Education Law and IDEA) upon the expiration of that non-residence.

      **2.**    **Whether the Family Foundation Was an Appropriate Placement to Meet A.N.H.'s Special Needs for the 2009-2010 School Year**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated above in Part III.A.2. of this Decision and Order.

      **3.**    **Whether the Equities Favor Tuition Reimbursement for the 2009-2010 School Year**

After carefully considering the matter, the Court answers this question in the affirmative for the following four reasons.

First, as the Court explained above in Part III.A.3. of this Decision and Order, the Court agrees with Plaintiffs that the law does not require that tuition reimbursement be denied if prior notice is not provided, but rather only that reimbursement may be denied or reduced if such notice is not provided. Moreover, the Court agrees with Plaintiffs that the purpose of the notice requirement is to give the district an opportunity prior to removal to investigate whether it can provide a FAPE to the student in its public schools. Here, the Court finds that it would have been futile for Plaintiffs to have given the District that opportunity, considering that, *at best*, the District would have done what it did on April 22, 2009 (merely recommend a specific program to which A.N.H. had not yet been accepted) or what it did repeatedly between May 4, 2009, and August 5, 2009 (merely give Plaintiffs a list of programs). The SRO does not appear to have expressly or sufficiently considered these facts. For these reasons, the Court exercises its authority to not deny or even reduce the reimbursement.

Second, as the Court explained above in Part III.A.3. of this Decision and Order, the Court is, in any event, persuaded by authority supporting the point of law that, where, as here, a district has abdicated the placement process to a parent (by giving the parent the names of residential placement facilities to investigate), and there is no indication in the record that the district was unaware that the parent had been exploring alternative placements, the district should be deemed to be on notice that the parent would act. *See Lamoine Sch. Comm*, 353 F. Supp.2d at 44.

Third, in any event, the Court is persuaded by the reasons offered by Plaintiffs and the IHO for excusing the notice requirement. *See, supra,* Parts I.D.1.b., I.D.2.a., I.D.2.c., and I.C.1. of this Decision and Order.  For example, comments made by Plaintiffs during the CSE meeting on August 5, 2009 (an reflected in Defendant's Exhibit 38) indicate their strong preference to keep A.N.H. at the Family Foundation and sufficiently communicated their intention to continue the placement at the Family Foundation if the District was unable to designate an appropriate placement.

Fourth, in support of his finding that A.N.H.'s mother denied advising the CSE during its meeting on August 5, 2009, that she would reject any residential placements the CSE proposed, that she would continue A.N.H.'s placement at Family Foundation, and that she would seek tuition reimbursement from the district, the SRO cited page "639" of the transcript.  (Dkt. No. 27, Attach. 1, at 39.)  However, that hearing testimony also explains that the reason A.N.H.'s mother did not advise the CSE of those facts is that Plaintiffs remained "open to an appropriate suggestion for another placement."  (Dkt. No. 29, Attach. 6, at 77 [attaching page "639" of transcript].)  More important, A.N.H.'s mother further explained that she remained so "open" at

the time of the hearing, on September 15, 2009–a time when she was both continuing to place A.N.H. at the Family Foundation and seeking tuition reimbursement from the District. (*Id.*) As a result, it was only through the use of blinders that one could have perceived the "open[ness]" in question as mutually exclusive with an intent to continue the placement at the Family Foundation and seek tuition reimbursement, in the absence of an appropriate placement by the District.

In addition, the SRO ignored the *substance* of Defendant's Exhibit 38, which indicates a rather clear commitment to continue A.N.H.'s placement there and seek tuition reimbursement, in the absence of an appropriate placement by the District. For example, Defendant's Exhibit 38 states as follows, in part: (1) "Parents will make appeal to regional officer if approval to continue [A.N.H.'s] education at The Family Foundation"; (2) "Parents feel that Family Foundation is best program and will continue to seek approval"; (3) "Parents encourage district/CSE to consider placement at Family Foundation"; (4) "[Parents share that A.N.H.] [s]hould be there for two more years"; (5) "Parents request that CSE recognize that the Family Foundation is best place for her"; (6) "Parents stress that [A.N.H.] was very ill and nearly dead prior to going to Family Foundation"; and (7) "[A.N.H.] has goals and aspirations again. This is b/c of the feedback and support that she is receiving at Family Foundation." (Dkt. No. 29, Attach. 1, at 65-68.) In addition, the SRO ignores the fact that, during the week of August 24, 2009, A.N.H.'s father communicated orally to the District's Director of Special Education the fact that Plaintiffs were continuing A.N.H.'s placement at the Family Foundation. *See, supra,* Part I.B.4. of this Decision and Order.

Finally, the SRO ignored the fact that all of Plaintiffs' failure to give written notice occurred during *August*, weeks if not days before the start of the 2009-2010 school year. The

SRO also ignored the fact that the imminent nature of the start of the school year was chiefly caused by (1) the District's failure (on April 22, 2009, June 4, 2009, and August 5, 2009) to recommend a specific program to which A.N.H. had been accepted, and (2) the District's Director of Special Education's decision to go on vacation when he could have been helping Plaintiffs find such a program. *See, supra,* Part I.B.4. of this Decision and Order. The SRO also ignored the fact that Plaintiffs' had an incentive to investigate and thoroughly consider the placements on the District's list, given the fact that they previously had to sell their home apparently in order to pay the cost of tuition at the Family Foundation. *See, supra,* note 7 of this Decision and Order. The Court finds that those are equitable considerations relating to the reasonableness of the action taken by Plaintiffs.

For all of these reasons, the Court awards Plaintiffs tuition reimbursement at the Family Foundation for that portion of the 2009-2010 school year starting after August 20, 2009.

### C.     Whether the District Acted with Bad Faith and/or Gross Misjudgment Under Section 504 of the Rehabilitation Act

After carefully considering the matter, the Court answers this question in the negative for the main reason stated by Defendant: Plaintiffs' lack of showing of bad faith or gross misjudgment on the part of Defendant. *See, supra,* Part I.D.1.a., I.D.1.c., and I.D.2.b. of this Decision and Order. The Court would add only two brief points.

First, although Defendant, on page 1 of its memorandum of law in chief, briefly argues as a threshold matter that this claim should be dismissed because Plaintiffs failed to exhaust their administrative remedies with regard to that claim, Defendant does not appear to elaborate on that argument elsewhere in that memorandum of law (*See generally* Dkt. No. 12, Attach. 2.) As a result, the Court does not base its holding on that rationale.

Second, given the Court's conclusions in Parts III.A. and III.B. of this Decision and Order, the Court acknowledges that the record contains evidence of repeated errors committed by the District between April 22, 2009, and the week of August 24, 2009.  However, the Court notes that the District's CSE met three times regarding A.N.H. between April 22, 2009, and August 5, 2009.  *See, supra,* Parts I.B.3.e., I.B.3.f. and  I.B.4. of this Decision and Order. Moreover, the District's Director of Special Education separately communicated with Plaintiffs at least four times between May 4, 2009, and the week of August 24, 2009.  *Id*.  This sort of responsiveness does not appear indicative of deliberate ignorance or gross misjudgment by the District.  Finally, while the Court does not commend the District's strategy of providing Plaintiffs a list of programs (rather than a specific program to which A.N.H. had been accepted), the Court finds that such a strategy does not appear indicative of bad faith.

As a result, Plaintiffs' claim under Section 504 of the Rehabilitation Act is dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 12) is **<u>GRANTED</u> in part** and **<u>DENIED</u>** in part; and it is further

**ORDERED** that Plaintiffs' cross-motion for summary judgment (Dkt. No. 14) is **<u>GRANTED</u> in part** and **<u>DENIED</u> in part**; and it is further

**ORDERED** that Defendant's "cross-motion" for summary judgment (Dkt. No. 17) is **<u>DENIED</u> as moot**; and it is further

**ORDERED** Plaintiffs' claim under Section 504 of the Rehabilitation Act is **<u>DISMISSED</u>**; and it is further

**ORDERED** that Plaintiffs' claim under the IDEA and New York Education Law is

**DISMISSED** **EXCEPT** to the extent that the claim regards the following two periods: (1) the period from May 1, 2009, to May 31, 2009; and (2) that portion of the 2009-2010 School Year starting after August 20, 2009; and it is further

**ORDERED** that Defendant's counterclaims (Dkt. No. 6) are **DISMISSED**; and it is further

**ORDERED** that the Clerk of the Court shall enter **JUDGMENT** in favor of Plaintiffs on their claim for tuition reimbursement under the IDEA and New York Education Law for the following two periods: (1) the period from May 1, 2009, to May 31, 2009; and (2) that portion of the 2009-2010 School Year starting after August 20, 2009.  The clerk is directed to close this case.

Dated: March 29, 2013
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge